DONALD F. ZIMMER, JR. (State Bar No. 112279)
CHERYL A. SABNIS (State Bar No. 224323)
KENDRA L. PAVKOVIC (State Bar No. 256729)
KING & SPALDING LLP
101 Second Street
Suite 2300
San Francisco, CA 94105
Telephone: (415) 318-1200
Facsimile: (415) 318-1300
Email: fzimmer@kslaw.com
  csabnis@kslaw.com
  kpavkovic@kslaw.com

DAVID F. NORDEN (Admitted *Pro Hac Vice*)
KING & SPALDING LLP
1180 Peachtree St., N.E.
Atlanta, GA 30309-3521
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
Email: dnorden@kslaw.com

Attorneys for Defendant
GLAXOSMITHKLINE LLC (formerly known as
SMITHKLINE BEECHAM CORPORATION d/b/a
GLAXOSMITHKLINE)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(OAKLAND DIVISION)

| | |
|---|---|
| CHARLES HORNISHER and PATRICIA HORNISHER Individually and as Personal Representatives of the Estate of ERIC JOHN HORNISHER, Deceased,<br><br>Plaintiffs,<br><br>v.<br><br>ELI LILLY and COMPANY; SMITHKLINE BEECHAM CORP. d/b/a GLAXOSMITHKLINE; and JOHN DOES 1-50,<br><br>Defendants. | Case No. 4:09-cv-01453-PJH<br><br>**DEFENDANT GSK'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:  February 17, 2010<br>Time:  9:00 a.m.<br>Room: 3rd Floor, Courtroom 3<br>Judge: Honorable Phyllis J. Hamilton |

# TABLE OF CONTENTS

**Page(s)**

I. NOTICE OF MOTION ................................................................................................1

II. BRIEF STATEMENT OF RELIEF REQUESTED ............................................1

III. STATEMENT OF FACTS ..........................................................................................2

    A. Paxil ................................................................................................................. 2

    B. Relevant 2004 FDA Regulatory Activity .................................................. 3

    C. Eric Hornisher's Psychosis, Anxiety, Depression, And Medical Treatment .......... 3

        1. The January 2004 Psychotic Episode. ....................................... 3

        2. With Independent Knowledge Of A Purported Risk Of SSRIs And Suicide, Dr. Hudson Prescribes Paxil to Mr. Hornisher ..................... 4

        3. Dr. Hudson Discusses Paxil And Reported Suicide Risk With Plaintiffs And Mr. Hornisher And Reaffirms His Paxil Prescription Decision. .................................................................................. 4

IV. ARGUMENT ................................................................................................................5

    A. Plaintiffs *Cannot* Prove Causation, An Essential Element Of Their Claims. ......... 6

        1. Learned Intermediary Doctrine — Duty To Warn Runs To The Physician. 6

            a. Plaintiffs Must Prove That The Allegedly Inadequate Or Absent Warning In Fact Caused Their Injury. ..............................6

            b. Dr. Hudson Was Aware Of the Risks About Which Plaintiffs Claim GSK Failed To Warn. ..........................................................7

            c. Dr. Hudson Did Not Read and Rely On The Paxil Labeling When Prescribing Paxil to Decedent. .............................................8

V. CONCLUSION ............................................................................................................11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ames v. Apothecon, Inc.*,
 431 F. Supp. 2d 566 (D. Md. 2006) .................................................................................... 7

*Ashman v. SK & F Lab Co.*,
 702 F. Supp. 1401 (N.D. Ill. 1988) ...................................................................................... 7

*Brown v. Superior Court*,
 44 Cal.3d 1049 (1988) ......................................................................................................... 6

*Carlin v. Superior Court*,
 13 Cal.4th 1104 (1996) ........................................................................................................ 6

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986) ............................................................................................................ 5

*Davis v. Wyeth Labs., Inc.*,
 399 F.2d 121 (9th Cir. 1968) .............................................................................................. 6

*Huntman v. Danek Med., Inc.*,
 1998 WL 663362 *1 (S.D. Cal. July 24, 1998) .................................................................. 8

*Khan v. Shiley Inc.*,
 217 Cal.App.3d 848 (1990) ................................................................................................ 7

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
 475 U.S. 574 (1986) ............................................................................................................ 5

*Minisan v. Danek Med., Inc.*,
 79 F. Supp. 2d 970 (N.D. Ind. 1999) .................................................................................. 7

*Motus v. Pfizer Inc.*,
 196 F. Supp. 2d 984 (C.D. Cal. 2001) ..................................................................... 6, 8, 9, 10

*Plenger v. Alza Corp.*,
 11 Cal.App.4th 349 (1992) .................................................................................................. 7

*Plummer v. Lederle Labs.*,
 819 F.2d 349 (2d Cir. 1987) ............................................................................................... 7

*Ramirez. v. Plough, Inc.*,
 6 Cal.4th 539 (1993) ....................................................................................................... 7, 8

*Rosburg v. Minnesota Mining & Mfg. Co.*,
 181 Cal.App.3d 726 (1986) ................................................................................................ 8

*Rutherford v. Owens-Illinois, Inc.*,
 16 Cal.4th 953 (1997) ......................................................................................................... 7

*Stanback v. Parke, Davis & Co.*,
  657 F.2d 642 (4th Cir. 1981) .................................................................................................. 7

*Whiteley v. Philip Morris, Inc.*,
  117 Cal.App.4th 635 (2004) ................................................................................................... 7

**Statutes**

Fed. R. Civ. P. 56(c) ....................................................................................................................... 5

# I.

# NOTICE OF MOTION

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on **February 17, 2010, at 9:00 a.m.**, or as soon thereafter as counsel may be heard by the above-entitled Court, located at 1301 Clay Street, Oakland, CA 94612, Defendant GlaxoSmithKline LLC, formerly SmithKline Beecham Corporation d/b/a GlaxoSmithKline ("GSK"), will and hereby does move this Court for summary judgment on the ground that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law because Plaintiffs cannot prove that GSK's alleged failure to warn caused their injuries. This Motion is based upon the accompanying Memorandum of Points and Authorities, the supporting Declaration of Cheryl A. Sabnis, all pleadings and papers on file in this action, and upon such other matters as may be presented to the Court at the time of the hearing.

# II.

# BRIEF STATEMENT OF RELIEF REQUESTED

Pursuant to Federal Rule of Civil Procedure 56(c), GSK hereby moves this Court for summary judgment on all claims alleged against it in Plaintiffs' Complaint: strict liability, negligence, and breach of warranty. All of Plaintiffs' claims against GSK are premised upon an alleged failure to warn in regard to its prescription antidepressant medication, Paxil CR® ("Paxil"). Proof of causation is an essential element of each claim. To prevail, Plaintiffs must prove that an allegedly inadequate Paxil label caused their injuries. Plaintiffs cannot do so.

Under California law, a manufacturer's duty to warn relative to prescription drugs runs only to the prescribing physician — not the patient. Where a prescribing physician testifies that he knew of a medication's purported risks from other sources, but prescribed the medication anyway, a drug manufacturer is not liable for failure to warn. Separately, where a prescribing physician testifies that he did not rely upon the operative labeling in prescribing the drug, a drug manufacturer likewise cannot be held liable.

Here, the prescribing physician, Dr. Hudson, testified that he possessed independent knowledge of the alleged risk of suicide and SSRIs, such as Paxil, when he prescribed Paxil for Eric

Hornisher on April 6, 2004, *and* he did not rely upon the operative Paxil labeling when he made his prescription decision.[1] Accordingly, GSK respectfully requests that the Court grant its motion for summary judgment and dismiss Plaintiffs' Complaint with prejudice.

## III.
## STATEMENT OF FACTS

Plaintiffs Charles and Patricia Hornisher (collectively "Plaintiffs") filed this lawsuit against GSK and Eli Lilly and Company ("Lilly") alleging that their adult son, Eric Hornisher ("Mr. Hornisher or Decedent"), committed suicide on April 19, 2004 as a result of his use of the prescription medications Zyprexa and Paxil. (Complaint, 2:5-13.)[2]

**A.   Paxil**

GSK marketed, promoted, conducted clinical trials involving, and for purposes of this litigation, manufactured the prescription pharmaceutical paroxetine hydrochloride, which is marketed and sold in the United States as Paxil. (Answer ¶ 3.) Paxil is generally classified as a selective serotonin reuptake inhibitor, or "SSRI." (*Id*. ¶ 4.) Paxil has been approved by the U.S. Food & Drug Administration ("FDA") as safe and effective for the treatment of depression, generalized anxiety disorder, panic disorder, social anxiety disorder, obsessive-compulsive disorder, and post traumatic stress disorder. (*Id*. ¶ 7.)

The Package Insert, or prescribing information, provided to physicians and contained in the Physicians' Desk Reference ("PDR") entry for Paxil in effect at the outset of 2004 included several paragraphs of warnings, including the following:

"**PRECAUTIONS:** *Suicide*"

> The possibility of a suicide attempt is inherent in major depressive disorder and may persist until significant remission occurs. Close supervision of high-risk patients should accompany initial drug therapy. Prescriptions for Paxil (paroxetine hydrochloride) should be written for the smallest quantity of tablets consistent with

---

[1] GSK vigorously disputes that Paxil causes suicidal thoughts or behavior. But that issue is immaterial to this Motion because a physician's independent knowledge of the alleged risk breaks the chain of causation in cases involving prescription medications and an alleged failure to warn.

[2] Plaintiffs originally alleged that a completely different medication, the anti-psychotic Zyprexa manufactured by Lilly, also caused Mr. Hornisher's suicide. (Complaint, ¶¶ 3, 15, 17.) GSK understands that Lilly and Plaintiffs have now resolved their dispute.

2

> good patient management, in order to reduce the risk of overdose. Because of well-established comorbidity between major depressive disorder and other psychiatric disorders, the same precautions observed when treating patients with major depressive disorder should be observed when treating patients with other psychiatric disorders.

(2004 Paxil Package Insert, at 8, attached as Exh. 1.)

**B.   Relevant 2004 FDA Regulatory Activity**

On March 19, 2004 — prior to Mr. Hornisher's Paxil prescription — FDA issued a letter to GSK requesting revision of its Paxil product labeling "in order to caution practitioners and patients about the need for close observation of patients being treated with antidepressants for clinical worsening, for the emergence of suicidality, and for the emergence of a variety of other symptoms that may represent a precursor to suicidality." (March 19, 2004 Letter from FDA to GSK, attached as Exh. 2.)

On March 22, 2004, FDA issued a Public Health Advisory cautioning about the need to closely monitor adults and children being treated with antidepressants to determine whether there is a worsening of depression. (March 22, 2004 FDA Public Health Advisory, attached as Exh. 3.)  In this advisory, FDA referenced the March 19, 2004 letter to drug manufacturers "asking manufacturers to change the labels of ten antidepressant drugs to include stronger cautions and warnings about the need to monitor patients for the worsening of depression and the emergence of suicidal ideation, regardless of the cause of such worsening," and FDA emphasized that "it is not yet clear whether antidepressants contribute to the emergence of suicidal thinking and behavior." (*Id.* at 1.)

**C.   Eric Hornisher's Psychosis, Anxiety, Depression, And Medical Treatment**

**1.   The January 2004 Psychotic Episode.**

Over two months before receiving Paxil, Mr. Hornisher experienced a psychotic episode at work. (Complaint ¶ 21.)  He was agitated, "not making sense," "expressed unusual ideas about a conspiracy at work" and was emergently transported by ambulance for immediate hospitalization. (*Id.*)  Mr. Hornisher was diagnosed with "Psychosis NOS" and prescribed Zyprexa, an anti-psychotic medication. (*Id.*)  His psychotherapist then referred him to a private psychiatrist, Dr. C. Richard Hudson, because Mr. Hornisher needed to be on medication or have his medication evaluated.

3

(Hudson Dep. at 41:15-41:22.)[3]

### 2. With Independent Knowledge Of A Purported Risk Of SSRIs And Suicide, Dr. Hudson Prescribes Paxil to Mr. Hornisher.

On April 6, 2004, Mr. Hornisher visited Dr. Hudson for evaluation and treatment. (*Id.* at 38:9-41:11.) During this appointment, Mr. Hornisher reported experiencing anxiety and depression, which prompted Dr. Hudson to prescribe Paxil 12.5 mg to treat Mr. Hornisher's psychological problems. (*Id.* at 51:14-21, 55:21-23.) Dr. Hudson also continued Mr. Hornisher on his anti-psychotic medication, Zyprexa. (*Id.* at 51:5-21.)

When prescribing SSRIs, such as Paxil, Dr. Hudson considers information from a variety of sources, including journal articles and conferences he attends, as well as information and reports from his colleagues based upon their experiences with medications. (*Id.* at 19:10-21:1.) Dr. Hudson testified that he was aware of a reported association between SSRIs and suicide at the time he prescribed Paxil to Mr. Hornisher. (*Id*. at 26:8-27:1; 74:12-79:20).[4] In making his prescription decision, Dr. Hudson weighed the risks and benefits of prescribing Paxil to Mr. Hornisher, concluded that the benefits of treatment with Paxil outweighed the risks (including that there was a reported association between suicide and SSRIs), and chose Paxil over other medications because he considered it effective in the treatment of anxiety and depression based on his experiences with other patients. (*Id.* at 53:8-25, 54:1-4, 74:13-74:16.) Dr. Hudson does not rely solely upon information provided by drug companies in prescribing medications, and did not read the labeling for Paxil at the time he prescribed the medication to Mr. Hornisher. (*Id.* at 20:7-11; 54:5-7.)

### 3. Dr. Hudson Discusses Paxil And Reported Suicide Risk With Plaintiffs And Mr. Hornisher And Reaffirms His Paxil Prescription Decision.

On April 14, 2004, Mr. Hornisher and his parents consulted with Dr. Hudson about the reported suicide risk with SSRIs. (Hudson Dep. at 78:6-78:19). During this telephone conference,

---

[3] Excerpts from Dr. Hudson's December 21, 2009 Deposition ("Hudson Dep.") are attached as Exhibit 8 to the Declaration of Cheryl A. Sabnis.

[4] The current labeling for Paxil states that no "causal link" has been established between SSRI medications and "worsening of depression and/or the emergence of suicidal impulses." (2009 Paxil Label, attached as Exh. 4, at 3). Indeed, FDA has never concluded that Paxil specifically, or SSRIs generally, cause suicide in adult patients.

Plaintiff Patricia Hornisher asked Dr. Hudson about the risk of suicide associated with taking Paxil. (*Id*. at 74:13-20, 78:6-80:4). Dr. Hudson testified that he told her that the risk of suicide was a reported risk associated with Paxil, but that the risk of suicide associated with untreated depression was greater. (*Id*.) Dr. Hudson testified that he also discussed the possible warning signs of suicide with Mr. Hornisher and his parents. (Hudson Dep. at 79:1-80:18.) The warning signs that Dr. Hudson typically mentions are: preoccupation with issues related to death, feeling that "family members would be better off without him," giving personal belongings away, and becoming more withdrawn from others. (*Id.* at 79:7-79:14). Dr. Hudson did not review the labeling for Paxil in relation to this conference.[5] (*Id*. at 78:6-78:19.) At the conclusion of the conference — merely one week after the original prescription — Dr. Hudson reaffirmed his decision that Paxil was the appropriate medication for Mr. Hornisher by recommending that he stay on Paxil. (*See id*. at 74:2-25; 78:6-79:23.)

# IV.

# ARGUMENT

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). A party is entitled to summary judgment in its favor "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Where, as here, the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party — the moving party need not disprove the other party's case. *Celotex Corp.*, *supra,* 477 U.S. at 325. Therefore, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on

---

[5] Dr. Hudson had a separate phone conference with Mr. Hornisher on April 12, 2004, when Mr. Hornisher called to discuss side effects that he associated with Paxil. Dr. Hudson also did *not* consult the operative Paxil labeling in relation to this call from Mr. Hornisher. (*See* Hudson Dep. at 69:19-70:8; 72:20-25).

5

1  which [it] will bear the burden of proof at trial." *Id.* at 322.

2  Plaintiffs' claims, regardless of the underlying theory, are all based on allegations that GSK
3  failed to warn Plaintiffs and Mr. Hornisher's prescribing physician of Paxil's possible adverse
4  effects. These claims fail because GSK did not have a duty to warn of an alleged risk already
5  independently known by Mr. Hornisher's prescribing physician, Dr. Hudson, and because a new or
6  revised warning in the Paxil label would not have made any difference in Dr. Hudson's decision to
7  prescribe Paxil, as he did not consult the label when prescribing Paxil to Decedent.

**A.   Plaintiffs *Cannot* Prove Causation, An Essential Element Of Their Claims.**

**1.   Learned Intermediary Doctrine — Duty To Warn Runs To The Physician.**

It is well established that California follows the learned intermediary doctrine, which states that "in the case of prescription drugs, the duty to warn 'runs to the physician, not to the patient.'" *Motus v. Pfizer Inc.*, 196 F. Supp. 2d 984, 990 (C.D. Cal. 2001) (granting SSRI antidepressant manufacturer's motion for summary judgment on strict liability, negligence and breach of warranty claims brought by widow whose husband committed suicide while taking Zoloft) *aff'd Motus v. Pfizer Inc.*, 358 F.3d 659 (9th Cir. 2004); *see Carlin v. Superior Court*, 13 Cal.4th 1104, 1116 (1996) ("in the case of prescription drugs, the duty to warn runs to the physician, not to the patient"); *Brown v. Superior Court*, 44 Cal.3d 1049, 1062 n.9 (1988) ("It is well established that a manufacturer fulfills its duty to warn if it provides adequate warning to the physician"); *Davis v. Wyeth Labs., Inc.*, 399 F.2d 121, 130 (9th Cir. 1968) (except in instances of vaccines distributed *en masse* to patients without physician intermediaries, warning to the prescribing physician is sufficient because "[i]n such cases the choice is essentially a medical one involving an assessment of medical risks in light of the physician's knowledge of his patient's needs and susceptibilities").

**a.   Plaintiffs Must Prove That The Allegedly Inadequate Or Absent Warning In Fact Caused Their Injury.**

"A plaintiff asserting causes of action based on failure to warn must prove not only that no warning was provided, but also that the inadequacy or absence of warning *caused* the plaintiff's injury." *Motus,* 196 F. Supp. 2d at 991 (emphasis added) (*citing Plummer v. Lederle Labs.*, 819 F.2d 349, 358 (2d Cir. 1987) (applying California law)); *see also Rutherford v. Owens-Illinois, Inc.* 16

6

Cal.4th 953, 968 (1997). Causation is an essential element of the products liability claims Plaintiffs allege against GSK. *See Khan v. Shiley Inc.,* 217 Cal.App.3d 848, 855 (1990) (causation is essential element to products liability action no matter what theory of recovery is utilized); *Whiteley v. Philip Morris, Inc.,* 117 Cal.App.4th 635, 696 (2004); *see also Motus,* 196 F. Supp. 2d at 986, 999 (finding no conceivable causal connection between the representations or omissions that accompanied the product and plaintiff's injury); *Ramirez. v. Plough, Inc.*, 6 Cal.4th 539, 556 (1993) (same).

### b.  Dr. Hudson Was Aware Of the Risks About Which Plaintiffs Claim GSK Failed To Warn.

A manufacturer has no duty to warn of a risk that is known and apparent to the physician. *See Plenger v. Alza Corp.*, 11 Cal.App.4th 349, 362 (1992) (holding that no authority exists that requires a manufacturer to warn of a risk that is known to the physician). In the absence of an adequate warning, a drug manufacturer is not liable if the prescribing physician knew of the medication's risks from other sources but prescribed the medication anyway. *See Plummer*, 819 F.2d at 359 (applying California law) ("no harm could have been caused by a failure to warn of a risk already known."); *Stanback v. Parke, Davis & Co.*, 657 F.2d 642, 645 (4th Cir. 1981) (affirming summary judgment and finding that drug manufacturer's failure to warn had no effect on plaintiff's injury); *Minisan v. Danek Med., Inc.*, 79 F. Supp. 2d 970, 978 (N.D. Ind. 1999) (granting medical device manufacturer summary judgment because surgeon knew of risks and inadequacy of labeling did not affect his use of spinal fusion); *Ashman v. SK & F Lab Co.*, 702 F. Supp. 1401, 1405 (N.D. Ill. 1988) ("the learned intermediary doctrine applies where a physician is alerted to the dangerous propensities of a particular drug and nonetheless decides to prescribe it."). At bottom, summary judgment is appropriate if the prescribing physician is informed about a drug's alleged risks independent of the manufacturer's warnings. *See Ames v. Apothecon, Inc.*, 431 F. Supp. 2d 566, 568 (D. Md. 2006) (granting summary judgment for manufacturer when prescribing physician knew of drug's risks about which plaintiff complained).

For instance, in *Plummer*, the prescribing physician testified that he knew of the information plaintiff claimed should have been in the package insert — that an unimmunized person should avoid contact with a vaccinee for 30 days — but did not warn Plaintiff's daughter, whose father

7

contracted polio from his vaccinated infant granddaughter. 819 F.2d 352, 358-59. Applying California law, the United States Court of Appeals for the Second Circuit confirmed that "'no harm could have been caused by failure to warn of a risk already known.'" *Id*. at 359 (quoting *Rosburg v. Minnesota Mining & Mfg. Co.,* 181 Cal.App.3d 726, 730 (1986)).

Here, Dr. Hudson knew about the alleged risk of suicidality associated with Paxil through other sources. In fact, the record shows that he was well-versed in the alleged risks of Paxil use, as well as the risks of antidepressants generally. Dr. Hudson testified that he was aware of a reported association between SSRIs and suicide at the time he prescribed Paxil to Mr. Hornisher. (Hudson Dep. 26:8-27:1; 74:12-79:20; 78:6-79:14). With knowledge of that risk, Dr. Hudson prescribed Paxil to Mr. Hornisher after weighing the risks and benefits, concluding that the benefits of treating him outweighed any of the risks, including that there was a possible association between suicide and SSRIs. (*Id*. at 54:1-54:4; 74:13-74:16). In fact, Dr. Hudson testified that he had a conversation with Mr. Hornisher and his parents about this risk, as well as the possible suicide "warning signs," and nonetheless recommended that Decedent stay on Paxil. (*Id*. at 78:6-78:19, 79:1-80:18). Because Dr. Hudson was already aware of a reported risk of suicide associated with SSRIs and chose to prescribe the medication anyway, Plaintiffs cannot establish that allegedly inadequate Paxil warnings caused their injuries. Their claims therefore fail as a matter of law.

   **c.**  **Dr. Hudson Did Not Read and Rely On The Paxil Labeling When Prescribing Paxil to Decedent.**

Summary judgment is also appropriate on failure to warn claims where the plaintiffs fail to produce any evidence that the treating physician would have acted any differently had an adequate warning been provided. *Motus, supra,* 196 F. Supp. 2d at 996, 999 (physician did not read labeling information until after decedent's suicide); *see also Huntman v. Danek Med., Inc*., 1998 WL 663362 *1, at *4 (S.D. Cal. July 24, 1998) (granting summary judgment to a manufacturer in a medical device failure to warn case because the doctor did not rely on any statements by manufacturer in deciding to perform treatment); *Ramirez,* 6 Cal. 4th at 555 (holding that because the plaintiff had not read the label, there was no causal connection between the representations and the plaintiff's injury).

In *Motus v. Pfizer,* the court granted the defendant summary judgment because the plaintiffs

8

failed to demonstrate that the allegedly inadequate SSRI warning caused the decedent's suicide. 196 F. Supp. 2d at 997. The *Motus* plaintiff claimed that the manufacturer failed to warn of an alleged risk of suicide associated with the medication, but the treating physician testified that he had not reviewed the label when deciding to prescribe the medication. *Id.* at 989. The Court therefore ruled that even if the warnings given by the manufacturer had been different, they would have made no difference to the prescribing physician. *Id.* In other words, because the *Motus* treating physician did not rely on the manufacturer's warnings when prescribing the drug to decedent, the plaintiff could not prove that the allegedly inadequate warnings caused the suicide. *Id.* at 999.

A similar fact pattern exists here. Plaintiffs cannot prove that inadequate Paxil labeling was a cause of their injuries. Based upon Dr. Hudson's testimony, a new or revised warning in the operative April 2004 Paxil label would *not* have made *any* difference in his decision to prescribe Paxil to Mr. Hornisher. Like the treating physician in *Motus*, Dr. Hudson did *not* rely on the operative labeling when deciding whether to prescribe Paxil to Decedent:

> **Counsel**: Did you read the current label or package insert before prescribing Paxil to Eric Hornisher?
>
> **Dr. Hudson**: No. I had read it in the past, but not prior to -- just prior to prescribing it for him.
>
> **Counsel**: Do you recall how long it had been since you had read the label or package insert for Paxil when you prescribed it to Mr. Hornisher?
>
> **Dr. Hudson**: I usually read them when the drug is introduced and I'm about to use it. But I couldn't tell you how long it had been.

(Hudson Dep. at 54:5-54:14).

FDA approved Paxil for treatment of depression in adults on December 29, 1992 — over 11 years before Dr. Hudson treated Decedent. (*See* December 29, 1992 FDA Paxil Approval Letter, attached as Exh. 5). There is no evidence that the Paxil labeling, as it existed in April 2004, had any impact on Dr. Hudson's decision to prescribe Paxil to Mr. Hornisher. If that labeling had been in any way different, it would not have mattered because Dr. Hudson did not consult it. Even when Dr. Hudson consulted with Dr. Hornisher and his parents following the Paxil prescription, Dr. Hudson again did not consult the operative Paxil labeling. (Hudson Dep. at 72:20-72:25, 99:6-99:15). In short, the operative Paxil labeling was irrelevant to Dr. Hudson's treatment of Mr. Hornisher.

9

Additionally, like the treating physician in *Motus*, Dr. Hudson testified that he relies upon multiple sources when prescribing medications to his patients: journals, case conferences, clinical conferences on psychopharmacology, his own experience with the medications, and information he learns from his colleagues including their experiences with a medication. (*Id.* at 19:10-19:16; 20:12-21:1). In fact, Dr. Hudson testified that his colleagues' experience with medications is "very important" to him and makes a "big impression" upon him in terms of his decisions to prescribe a certain medication. (*Id.* at 20:12-20:21). Dr. Hudson's decision to prescribe Paxil to Mr. Hornisher was based on his experience with Paxil — a drug that he had found to be safe and effective and which he still prescribes today. (*See Id.* at 16:23-17:5, 24:2-24:17, 53:14-53:23). Dr. Hudson testified as follows:

**Counsel:** When you say that the [decedent's] complaints of depression and anxiety are chronic in nature, what do you mean?

**Dr. Hudson:** Well, the history he gave me, having anxiety, social anxiety type symptoms most of his life, avoiding parties and dating and having no friends or few friends, based on that information, I felt that he suffered from some chronic anxieties, so Paxil seemed to be a good drug to address those along with the depression.

**Counsel:** And then so I understand, you -- are you indicating that you prescribed Paxil to treat Mr. Hornisher's depression and his anxiety?

**Dr. Hudson:** Right.

**Counsel:** Okay. Did you consider any other medications options for Mr. Hornisher in terms of treating his depression.

**Dr. Hudson:** Well, you know, as I was listening to him, I kind of go through a mental process of thinking about what drug might be the one I want to select to begin with and Paxil came up.

**Counsel:** Were there any others that came up as possibilities in your mind?

**Dr. Hudson:** I don't remember specifically, but I'm sure I kind of did a mental checklist of most of the other antidepressants and tried to pick one I thought might be a good place to start.

**Counsel:** Why did you choose Paxil over other medications for Mr. Hornisher?

**Dr. Hudson:** I believe that at that point in time Paxil was FDA approved for both depression and social anxiety disorder and had a reputation for being a drug to treat both of those conditions, so I selected that one.

(*Id*. at 52:8-54:14).

Dr. Hudson's testimony is unequivocal that he did *not* consult or rely on the operative Paxil labeling in making his decision to prescribe Paxil to Mr. Hornisher on April 6, 2004.  In fact, Dr. Hudson testified that he did *not* consult the labeling *at any time* in relation to his treatment of Mr. Hornisher.  When Dr. Hudson prescribed Paxil to Mr. Hornisher on April 6, 2004, he did *not* consult the operative labeling.  (*See id*. at 54:5-8).  When Mr. Hornisher called Dr. Hudson on April 12, 2004 to discuss side effects Mr. Hornisher associated with the medication, Dr. Hudson did *not* consult the operative Paxil labeling.  (*See id.* at 69:19-70:8; 72:20-25).  When Dr. Hudson testified that on April 14, 2004, he discussed risks of Paxil with Mr. Hornisher and his parents, including risk of suicide, Dr. Hudson did *not* consult the operative Paxil labeling.  (*See id.* at 74:2-25; 99:6-15).  In short, the operative Paxil labeling was *immaterial* to Dr. Hudson's treatment of Mr. Hornisher: It is immaterial what the operative Paxil labeling did or did not say because it played *no role* in Dr. Hudson's decision to prescribe Paxil.  Summary judgment in favor of GSK is therefore appropriate.

## **V.**

## **CONCLUSION**

For the reasons set forth above, GSK respectfully requests that the Court grant its motion for summary judgment and dismiss Plaintiffs' Complaint with prejudice.  Plaintiffs cannot establish that any alleged failure to warn by GSK was a cause of their injuries.  Without evidence of causation, Plaintiffs cannot prove their case and it must be dismissed.

Respectfully submitted,

Dated: January 11, 2009    KING & SPALDING LLP

By:    /s/ Cheryl A. Sabnis /s/
    Donald F. Zimmer, Jr.
    Cheryl A. Sabnis
    Kendra L. Pavkovic

Attorneys for Defendant
GLAXOSMITHKLINE LLC (formerly known as
SMITHKLINE BEECHAM CORPORATION d/b/a
GLAXOSMITHKLINE)