E. Glynn Stanley, Jr., Esq.
California Bar No. 62884
728 Texas Street
Fairfield, CA 94533
Telephone: 707-425-5291
Facsimile: 707-425-5338
*Counsel for Plaintiffs*

Arnold Anderson (Andy) Vickery, Esq.
Texas Bar No. 20571800
Fred H. Shepherd, Esq.
Texas Bar No. 24033056
VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, TX 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939
*Counsel for Plaintiffs*
(Shepherd Admitted *Pro Hac Vice*)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(OAKLAND DIVISION)

| | | |
|---|---|---|
| CHARLES HORNISHER and PATRICIA HORNISHER, Individually and as Personal Representatives of the Estate of ERIC JOHN HORNISHER, Deceased, Plaintiffs, vs. ELI LILLY and COMPANY; GLAXOSMITHKLINE, LLC; and JOHN DOES 1-50, Defendants. | § § § § § § § § § § § § § § § | CASE # 4:09-cv-01453-PJH **PLAINTIFFS' RESPONSE IN OPPOSITION TO GSK'S MOTION FOR SUMMARY JUDGMENT** **Date: March 3, 2010** **Time: 9 a.m.** **Room: 3rd Floor, Courtroom 3** **Judge: Hon. Patricia J. Hamilton** |

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

# **Table of Contents**

**Page(s)**

Table of Authorities...................................................................... iv

I.    INTRODUCTION........................................................................ 1

II.   STATEMENT OF MATERIAL FACTS.......................................... 2

    A.    Who This Case is About - Eric Hornisher................................. 2

    B.    Eric's Paxil Prescription and What Dr. Hudson Actually Knew About
        the Risks of Paxil Therapy....................................................... 5

    C.    Dr. Hudson Does Not Warn the Hornishers of a Risk of Paxil-
        Induced Suicide.................................................................... 8

    D.    Relevant FDA Regulatory Activity...The Part GSK Leaves Out............... 9

III.  ARGUMENT............................................................................ 10

    A.    GSK is Not Entitled to Summary Judgment On Its Learned
        Intermediary Defense Because It Has Not Proven An Adequate
        Warning and Because Dr. Hudson Was Not Aware Paxil Could Cause
        Suicide.............................................................................. 10

        1.    Summary Judgment Standards.................................... 10

        2.    It is GSK's Burden to Prove the Application of the
            Learned Intermediary Doctrine.................................... 11

        3.    By Failing to Prove it Gave an Adequate Warning,
            GSK's Motion Must Fail........................................... 11

        4.    An Adequate Warning Would have Changed Dr.
            Hudson's Actions.................................................. 14

        5.    Dr. Hudson was Aware of, and Replied Upon, GSK's
            Label When Prescribing Paxil to Eric Hornisher................... 17

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-ii-

B.    California's Likely Adoption of the RESTATEMENT (THIRD) Learned
        Intermediary Exceptions Also Negates GSK's Motion. . . . . . . . . . . . . . . . . . . . . 21

IV.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

1

## **Table of Authorities**

2

**Cases**                                                                                      **Page(s)**

3

*Amore v. G.D.Searle & Co.*,

4
    748 F.Supp. 845 (S.D. Fla. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

5
*Anderson v. Liberty Lobby, Inc.*,

6
    477 U.S. 242 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

7
*Black v. Merck & Co., Inc.*,
    2004 WL 5392660 (C.D.Cal. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

8
*Boeken v. Philip Morris, Inc.*,

9
    2001 WL 1894403 (Cal.Superior 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

10
*Brown v. Superior Court*,

11
    44 Cal.3d 1049 (Cal. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 23

12
*Canfield v. Security-First Nat. Bank of Los Angeles*,
    13 Cal.2d 1 (Cal. 1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

13

14
*Carlin v. Superior Court*,
    13 Cal.4th 1104 (Cal. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

15
*Carmichael v. Reitz*,

16
    17 Cal.App.3d 958 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

17
*Celotex Corp. v. Catrett*,

18
    477 U.S. 317 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13

19
*Conte v. Wyeth, Inc.*,
    168 Cal.App. 4th 89 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

20

21
*Evraets v. Intermedics Intraocular, Inc.*,
    29 Cal.App. 4th 779 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

22
*Freeman v. Hoffman-La Roche, Inc.*,

23
    618 N.W.2d 827 (Ne. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

24
*Gasperini v. Center for Humanities Inc.*,

25
    518 U.S. 415 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

26

Plaintiffs' Response in Opposition to                    VICKERY, WALDNER & MALLIA, LLP
GSK's Motion for Summary Judgment                        One Riverway, Suite 1150
Case #4:09-cv-01453-PJH                                   Houston, Texas 77056-1920
                                                          Telephone: 713-526-1100
                                                          Facsimile: 713-523-5939

27

28
                                            -iv-

*Giles v. Wyeth, Inc.*,
    500 F.Supp.2d 1063 (S.D.Ill. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Gonzalez v. Autoliv ASP, Inc.*,
    154 Cal.App. 4th 780 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Griffith v. Blatt,*
    51 P.3d 1256 (Or. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Huntman v. Danek Medical, Inc.*,
    1998 WL 663362 (S.D.Cal. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Paxil Litigation*,
    212 F.R.D. 539 (C.D.Cal. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Jimenez v. Superior Court,*
    29 Cal.4th 473 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Larkin v. Pfizer, Inc.*,
    153 S.W.3d 758 (Ky. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Martin v. Merck & Co., Inc.*,
    2005 WL 1984483 (E.D.Cal. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Motus v. Pfizer Inc.*,
    196 F. Supp 2d 954 (C.D. Cal. 2001). . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19, 20, 21

*Notmeyer v. Stryker Corp.*,
    502 F.Supp.2d 1051 (N.D.Cal. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

*Perez v. Wyeth Laboratories, Inc.*,
    734 A.2d 1245 (N.J. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Plenger v. Alza Corp.*,
    11 Cal.App. 4th 349 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Plummer v. Lederle Labs.*,
    819 F.2d 349 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

*Rimbert v. Eli Lilly,*
    2008 WL 4330626 (D.N.M. August 22, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Salyards ex rel. Salyards v. Metso Minerals Tamper OY,*
    2005 WL 3021959 (E.D.Cal. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Sherman v. Stryker Corp.,*
    2009 WL 2241664 (C.D.Cal. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*State ex. rel. Johnson & Johnson Corp. v. Karl,*
    647 S.E.2d 899 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Stevens v. Parke, Davis & Co.,*
    9 Cal.3d 51 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11, 12, 13, 23

*Taylor v. Elliott Turbomachinery Co., Inc.,*
    171 Cal.App. 4th 564 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger Co.,*
    129 Cal.App. 4th 577 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Tobin v. SmithKline Beecham Pharmaceuticals,*
    164 F.Supp.2d 1278 (D.Wy. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13, 21, 23

*Tovar v. U.S.P.S.,*
    3 F.3d 1271 (9th Cir.1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Vitanza v. The Upjohn Co.,*
    778 A.2d 829 (Conn. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Wendell v. Johnson & Johnson,*
    2010 WL 271423 (N.D.Cal. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Statutes**                     **Page(s)**

21 C.F.R. § 208. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Other**                     **Page(s)**

RESTATEMENT (THIRD) OF TORTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21, 22, 23, 24, 25

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-vi-

## I.     INTRODUCTION.

In April of 2004, when 24-year old Eric Hornisher received a prescription for Paxil from Dr. Hudson, there was **no warning** about the risk of Paxil-induced suicidality.  Today, there are two, *i.e.,* (a) a BLACK BOX warning to alert physician/intermediaries about this risk, and (b) a "Patient Medication Guide" to alert the patients themselves.  Despite these facts, and the fact that Eric's death by self-inflicted gun shot wound two weeks after he began taking Paxil, and his experience of agitation like precursor side effects prior to his death fit the "classic pattern" of a Paxil-induced suicide, Defendant GlaxoSmithKline, hereinafter "GSK," seeks summary judgment based on its "learned intermediary" affirmative defense.

The California Supreme Court adopted this industry-specific common law defense in 1973[1], and, although other courts have recently rejected it as "outmoded and unpersuasive,"[2] for purposes of the present motion, the Court need not engage in the *Erie* prediction as to whether California would adhere to some form of the defense or not, for the simple reason that *it makes no difference*.

On the unique facts before the Court, even assuming the applicability of the doctrine, GSK is not entitled to summary judgment for three separate and independent reasons.  First, GSK has failed to plead and prove that it provided an adequate warning about this risk to Dr. Hudson.  This is an essential element of the defense, because, without an adequate warning, the prescribing physician cannot be said to be truly "learned."

---

[1]  *Stevens v. Parke, Davis & Co.*, 9 Cal.3d 51, 65 (1973).

[2]  *State ex. rel. Johnson & Johnson Corp. v. Karl*, 647 S.E.2d 899, 906 (2007)(rejecting doctrine).  *See Rimbert v. Eli Lilly,* 2008 WL 4330626 (D.N.M. August 22, 2008)(predicting that New Mexico Supreme Court would reject doctrine today; *Griffith v. Blatt,* 51 P.3d 1256 (Or. 2002)(rejecting defense in strict liability cases).

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

Second, summary judgment is also unwarranted because the record facts demonstrate that Dr. Hudson *does heed warnings* and that an adequate warning in this case would probably (and perhaps presumptively), have saved Eric's life.

Finally, because it is highly likely that *if* California adheres to this antiquated doctrine at all, it would, at minimum, embrace the RESTATEMENT (THIRD) OF TORTS, §6(d) formulation of it. Therefore, summary judgment is unwarranted because the *exception* to the learned intermediary "*rule*" would apply and would require a direct-to-patient warning on the facts of this case.

## II.    STATEMENT OF MATERIAL FACTS.

**A.    Who This Case is About - Eric Hornisher.**  Eric John Hornisher was born February 14, 1980 in Portland Oregon.  Exhibit 1 (Obituary).  He died by a self-inflicted gunshot wound to the head on April 19, 2004 and was 24 years old at the time of his death.  Exhibit 2 (Death Certificate).  The tragic death of this talented young man occurred less than two weeks after he began taking Paxil.[3]  Exhibit 2; Exhibit 3 at 18 (Hudson Medical Records).

Although born in Portland, Eric was raised in Napa.  Exhibit 1.  As a young man, he was a gifted artist, musician, athlete, and an Eagle Scout.  *Id*.; Exhibit 4 (Resume); Exhibit 5 (Art).  But Eric's talents extended beyond these interests.  He ultimately attended, and graduated *cum laude*, from the University of Santa Clara in 2002 with a degree in mechanical engineering.  Exhibit 1 and Exhibit 4.  He was inducted into two engineering honor societies and went on to earn a Master's Degree with honors in Mechanical Engineering from Santa Clara in 2003.  *Id*.  One look at Eric's

---

[3]  Although Eric was actually prescribed Paxil CR, for purposes of convenience, Plaintiffs will simple refer to it as Paxil herein.

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-2-

resume reveals the highly complex and technical world in which this young man was excelling.

Exhibit 4.

Given his exceptional academic credentials and the breadth of his talents, it is no wonder Eric

was able to obtain a high paying position within the defense industry immediately upon graduation.

Exhibit 6 at 42:8-43:4 (Deposition of Charles Hornisher).   Eric was "thrilled" to find such

employment upon graduation.   *Id*.   Yet, the thrill soon lost its luster for Eric after he began to

understand and experience what working in a high pressure, secretive environment during a time of

war actually entailed.   Exhibit 7 at 67:17-68:6 (Deposition of Patricia Hornisher).   Eric was isolated,

felt lonely, and by his own admission got caught up in the "politics" and industrial paranoia of his

work environment.   Exhibit 6 at 43:20-45:9.   Although neither an alcoholic nor drug abuser, he

struggled to find ways to cope with his oppressive work conditions.   Exhibit 3 at 19; Exhibit 8 at 93

(Chou Medical Records).[4]   Ultimately, on January 20, 2004, he experienced a "brief psychotic"

break.   Exhibit 3 at 18; Exhibit 8 at 93.   He was hospitalized for 72 hours.   Exhibit 3 at 18.   During

his hospitalization, he was treated with, among other things, Zyprexa.   *Id.* at 18.

Over the course of the next few months, Eric saw a multitude of healthcare professionals due

to insurance constraints as well as convenience.[5]   Exhibit 7 at 88:21-89:11.   During the course of this

---

[4]   Although a hospital record associated with Eric's admission on January 20, 2004 lists "GHB?" under intoxication assessment, the subsequent screening was negative.   Exhibit 9 at 33 (Santa Clara Valley Medical Center Records).   Eric denied any drug abuse to his health care providers and was not known to abuse alcohol or illegal drugs.   Exhibit 7 at 40:16-41:8; Exhibit 10 at 76:12-20 (Deposition of Singshan Chou, M.D.).

[5]   Eric's remained in Santa Clara (where he was employed) for a period of time after his hospitalization, but eventually moved back to Napa in order to be with his parents.   Exhibit 7 at 73:11-13.

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

Vickery, Waldner & Mallia, llp
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-3-

treatment and while on Zyprexa (but not yet Paxil), Eric reported to his providers that the Zyprexa was making him feel "drowsy" and lethargic (or having a sedative effect), but that it reduced any feelings of paranoia.[6] Exhibit 3 at 19; Exhibit 10 at 36:6-37:7; 61:22-62:3. He specifically attributed this lethargy to the Zyprexa. *Id.* at 21. More importantly to this case, he continually denied suicidal ideation to any of his healthcare providers while on the Zyprexa nor did they believe him to be suicidal. Exhibit 3 at 19, 21; Exhibit 10 at 75:13-76:5; Exhibit 11 at 146 (Harp Medical Records).

During the course of his recovery, Eric was concerned about his future. Specifically, he was concerned about his future job prospects and making enough money to pay his own way. Exhibit 6 at 203:4-204:1. Although his parents repeatedly reassured Eric they would financially help him, it was not surprising Eric would be so concerned because he was a self-sufficient person. *Id.* So, like everything else in his life, he focused on trying to get a new job during the course of his recovery, to include interviewing and declining a prospective job opportunity because he did not believe the salary to be commensurate with his experiences and education. Exhibit 6 at 63:6-22; 191:7-20.

Eric was prescribed Paxil on April 4, 2004 by a Napa area psychiatrist named Dr. Richard Hudson. Exhibit 3 at 19. Almost immediately Eric began to complain of side effects he specifically attributed to the Paxil. Namely, he complained to Dr. Hudson that Paxil made him feel "hot" and "anxious." Exhibit 12 at 69:3-10; 70:9-23 (Deposition of Richard Hudson, M.D.). He reported this anxiety was different than he had been experiencing prior to taking Paxil. *Id.* at 71:16-72:4; 134:3-

---

[6] The ostensibly "learned" intermediary's testimony regarding Zyprexa was markedly different from that regarding Paxil. Consequently, Plaintiffs resolved their claims against Eli Lilly via a modest settlement.

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-4-

135:3.  He also discussed his increase in anxiety on Paxil with his therapist.  Exhibit 11 at 150.  In fact, Eric told both his doctor and his therapist he no longer wanted to take the Paxil because he was not sure it was helping.  *Id.*; Exhibit 3 at 21.  However, and to tragic effect, he was encouraged to stay on the medication by both his physician and his therapist – neither of whom had been warned about the risks of Paxil-induced suicidality.  *Id.*

On April 19, 2004, less than two weeks after initiating Paxil therapy, Eric went into his parent's bed room, assembled his father's .45 caliber pistol from under the bed, and shot himself in the head.  Exhibit 6 at 211:5-19; Exhibit 13 (Coroner's Report).  Despite Eric's pleas to God for help with his increased anxiety from the Paxil, it was simply not enough to stop this horrible tragedy.  Exhibit 11 at 149.  He was buried in Napa on April 24, 2004.  Exhibit 1.

**B.     Eric's Paxil Prescription and What Dr. Hudson Actually Knew About the Risks of Paxil Therapy.**  On April 4, 2004, Eric was first seen by Dr. Hudson.  Exhibit 3 at 18-19.  During this initial examination, Eric again specifically denied suicidal and/or homicidal ideation.  *Id.*  He was also neither psychotic nor delusional.  *Id.*  As previously mentioned, Eric specifically complained to Dr. Hudson that the Zyprexa was making him lethargic.  *Id.*  Dr. Hudson also specifically suspected the Zyprexa may be responsible for the lethargy.  *Id.*  However, because Dr. Hudson believed Eric to be experiencing some combination of depression and anxiety, he started him on the antidepressant Paxil CR.  *Id.*

At the time of Eric's prescription, the Paxil label contained language regarding suicide under the "Precautions" heading of the label.  This language tied any potential risk of suicide to the *illness* not the *medication.*  Exhibit 12 at 130:25-131:7; 131:14-18; 132:1-6; *see also* GSK's Motion at 2-3.

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-5-

Dr. Hudson confirmed that his understanding of any risk of suicide was tied to the mental illness and not that Paxil itself could cause suicide. *Id*. at 138:13-23.

At the time of this prescription, Dr. Hudson's standard instructions and warnings he passed on to patients with regard to Paxil concerned an upset stomach, sexual dysfunction, agitation, and weight gain. *Id*. at 24:18-28. There was nothing about suicide. *Id*. In fact, Dr. Hudson's understanding at the time *vis-a-vis* the potential for drugs like Paxil to cause suicide was in his own words:

> "We didn't understand what could happen. Our interpretation was that the patient probably had some suicidal thinking and they got put on an antidepressant and in the process of being treated with antidepressants, they became more aware of their suicidal thinking or their energy level went up and their impulses in that direction became more intense, but there was no real conception that the drug itself precipitated the suicidal thinking."

*Id*. at 32:16-24. In fact, at first, he and his professional colleagues tended to dismiss the potential for antidepressants to cause suicidality. *Id*. at 32:11-16;146:10-147:5.

The state of awareness and the information available to Dr. Hudson that Paxil (or SSRI's[7] in general) may cause or contribute to suicidality was new to him at the time of his prescription to Eric. *Id*. at 109:16-20. He further testified that it wasn't until after Eric's death that he became aware of "links being made" in the medical literature regarding Paxil's ability to cause suicidality in the early stage of treatment. *Id.* at 106:17-107:21. At the time he treated Eric, he did not believe Paxil *itself* could cause suicide. *Id*. at 109:22-110:3. He now believes Paxil can cause suicide in

---

[7] Paxil is one of a family of antidepressants known as Selective Serotonin Reuptake Inhibitors ("SSRI's"). While the chemical properties of each may differ, this family of antidepressants all have a similar method of action and specifically target the levels of serotonin in the brain.

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-6-

certain patients within the first month of treatment. *Id*. at 110:4-111:14. And, he now believes it is distinctly possible Paxil played a role in Eric's death. *Id*. at 98:1-21.

Moreover, at the time he was treating Eric, Dr. Hudson specifically did not attribute the agitation seen in patients taking Paxil (and of which he may have mentioned to Eric) as a contributor to suicide: "Yeah. I don't believe that I fully appreciated at that time that agitation could contribute to suicidal behavior as much as I appreciate it currently." *Id*. at 80:8-11. He now feels differently. *Id*. at 135:4-12.

Today, unlike then, the current Paxil prescribing information (or "label") contains a BLACK BOX warning regarding suicidality, extensive language regarding the potential for the onset of suicidality in the early stages of Paxil therapy, and a Patient Medication Guide [hereinafter "PMG"].[8] Exhibit 14 at 1, 11-13, and 41-42. It also contains instructions to warn caregivers as well as the patient about this information. *Id*. Dr. Hudson did not have this information available to him at the time he prescribed Paxil to Eric. Exhibit 12 at 145:10-146:5. Dr. Hudson believes the current label and BLACK BOX warning is not only more extensive, but also highlights important safety information to physicians that he needs to be aware of when prescribing medication. *Id*. at 116:6-117:23; 119:13-24. Further, it is his belief that unlike the label in effect at the time of Eric's prescription, the most current version specifically ties a risk of suicide to the use of the medication itself vice the disease

---

[8] A Patient Medication Guide is simply a patient information sheet written in easy to understand language that highlights the most important safety information regarding a prescription drug. The current Paxil PMG specifically highlights potential precursor conditions to suicide. *Id*. at 120:8-13; Exhibit 14 at 41-42 (Current Paxil Label). It is designed for non-medically trained individuals to understand and be warned. There was no PMG available to either Dr. Hudson or the Hornisher's at the time of Eric's prescription. Exhibit 12 at 119:1-12.

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-7-

being treated.  *Id*. at 130:25-131:7; 131:14-18; 132:1-6.[9]  He now specifically discusses the information contained in the **BLACK BOX** with patients.  *Id*.

Today, Dr. Hudson said his warnings are very different.  Today, unlike 2004, he specifically discusses with patients the issue of suicidality during the early phases of antidepressant therapy, and the potential for agitation to be a precursor to suicide.  *Id*. at 24:18-26:16; 27:6-22.[10]

Although GSK's argues to the contrary, Dr. Hudson does rely upon them to pass along the most accurate information regarding side effects, including label changes.  *Id*. at 121:17-23; 122:14-18.  More importantly if he had been told that Paxil increased the risk of suicide in any particular patient population, he would "probably tend" not to prescribe it.  *Id*. at 128:8-22.

### C.   Dr. Hudson Does Not Warn the Hornishers of a Risk of Paxil-Induced Suicide.

On April 14, 2004, Dr. Hornisher participated in a telephone conference with Eric and his parents.  Exhibit 6 at 230:13-231:10; Exhibit 7 at 172:12-173:23; Exhibit12 at 146:10-147:5.  During the course of this conversation, Patricia Hornisher raised the question of the potential for Paxil to cause suicide.  *Id*.  Dr. Hudson did not tie any risk of suicide to the use of the Paxil itself.  *Id*.  In fact, he told the Hornisher's just the opposite, that he did not believe any reported risk of suicide was specific to Paxil and that it was more risky NOT to treat depression.  Exhibit 12 at 78:6-19.  His "warning" was entirely consistent with the label GSK admits was in effect at that time.  *See* GSK's Motion For

---

[9]  When Dr. Hudson was asked how the new label specifically linking the onset of suicidality to the use of the medication itself would effect his prescribing decision, he was instructed not to answer by his counsel.  *Id*. at 132:19-133:8.

[10]  The **BLACK BOX** warning Dr. Hudson references in this snippet of testimony was mandated on October 15, 2004 by the FDA.  Exhibit 15 (October 15, 2004 FDA Advisory).  Clearly this is well after Eric's death.

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-8-

Summary Judgment at 2-3 and exhibit thereto.  If Dr. Hudson had told the Hornisher's that Paxil itself could cause or contribute to suicide, they would have chosen a different medication.  Exhibit 6 at 230:13-231:10.

**D.  Relevant FDA Regulatory Activity...The Part GSK Leaves Out.**  On June 6, 2001, a Wyoming jury found that Paxil can cause some people to become homicidal and/or suicidal." Exhibit 16 (*Tobin* Verdict).  It also found GSK to be at "fault" for failing to warn and to test about this risk.  *Id*.  The court held, both before and after the verdict, that it was supported by scientifically reliable, legally admissible evidence.  *Tobin v. SmithKline Beecham Pharmaceuticals*, 164 F.Supp.2d 1278 (D.Wy. 2001).  In the wake of this verdict, GSK did nothing to warn doctors or caregivers. Rather, to the contrary, the Vice President of Marketing, Bonnie Rossello, issued a voice mail telling the sales representative "do not bring this issue up with your doctors."  Exhibit 17 at 33-35 (Deposition of Bonnie Rossello, taken on December 14, 2006 in *Van Dyke v. GlaxoSmithKline*).

Then, on March 22, 2004, the FDA issued a public health advisory *requiring antidepressant manufacturers* to change their labels to include a warning that healthcare providers should carefully monitor all patients beginning antidepressant therapy for worsening illness and emergent suicidality. *See* GSK's Motion For Summary Judgment at 3 and exhibit thereto.  The advisory further provided that patients, family, and caregivers should be instructed to be alert for signs and symptoms associated with suicidality, worsening illness, and the onset of suicidality.  *Id*.  However, GSK did not actually advise physicians of the label change or otherwise advise physicians of the new warning until May 2004, one month <u>after</u> Eric Hornisher had been given Paxil.  Exhibit 18 (May 2004 GSK Dear Healthcare Professional Letter).  Prior to this letter, and despite the *Tobin* verdict, GSK did absolutely nothing to warn any healthcare professional about the potential for Paxil-induced suicide.

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-9-

Beginning in early 2005, again at the insistence of the FDA, GSK's label for Paxil has contained a BLACK BOX warning about the risk of suicide and specifically highlights this risk in patients of Eric's age irregardless of psychiatric disorder. Exhibit 14 at 1. Also, since early 2005, and as mentioned previously, all patients receiving Paxil are also supposed to get their own, suicide-specific PMG, to alert them directly about this risk. *Id.* at 41-42.

Finally, In May 2006, GSK sent out another "Dear Doctor" letter, analyzing preexisting clinical trial data, and advising physicians about a six-fold increase in the risk of suicide for some adult patients as well as a higher risk of suicide in patients of Eric's age across both depressive and non-depressive illnesses. Exhibit 19 (May 2006 GSK Letter).

## III.   ARGUMENT.

### A.   GSK is Not Entitled to Summary Judgment on its Learned Intermediary Defense Because it Has Not Proven an Adequate Warning and Because Dr. Hudson Was Not Aware Paxil Could Cause Suicide.

**1.   Summary Judgment Standards.** Federal summary judgment standards emanate from the *Celotex* trilogy of cases. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). As the movant for summary judgment, GSK bears the "burden" of demonstrating that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law. *Celotex*, 477 U.S. 317, 323-24. "In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the nonmoving party." *Notmeyer v. Stryker Corp.*, 502 F.Supp.2d 1051, 1053 (N.D.Cal. 2007).

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-10-

**2.    It is GSK's Burden to Prove the Application of the Learned Intermediary Doctrine.**  The crux of GSK's motion for summary judgment is the learned intermediary doctrine. GSK pled this doctrine as an affirmative defense, Doc. 14 at 10, Sixteenth Affirmative Defense (GSK Answer), and case law recognizes it as such.  *E.g., In re Paxil Litigation*, 212 F.R.D. 539, 542 (C.D.Cal. 2003)*; Giles v. Wyeth, Inc*., 500 F.Supp.2d 1063 (S.D.Ill. 2007) and cases cited therein.

Beyond the summary judgment standard, as an affirmative defense, GSK also bears the burden of proof as to each element of its affirmative defense.  *Tovar v. U.S.P.S.*, 3 F.3d 1271, 1284 (9th Cir. 1993) ("In every civil case, the defendant bears the burden of proof as to each element of an affirmative defense.").  However, since this is a diversity action, the proper application of this affirmative defense sounds in state substantive law.  *Gasperini v. Center for Humanities Inc.*, 518 U.S. 415, 427 (1996).  Thus, we look to California courts to determine the proper application of the learned intermediary doctrine and whether GSK can carry their burden.

**3.    By Failing to Prove it Gave an Adequate Warning, GSK's Motion Must Fail.**  The California Supreme Court first recognized the learned intermediary doctrine in *Stevens v. Parke, Davis & Co.*, *supra*.  Therein, the court stated that "[i]n the case of medical prescriptions, if adequate warning of potential dangers of a drug has been given to doctors, there is no duty by the drug manufacturer to insure that the warning reaches the doctor's patient for whom the drug is prescribed."  *Id*. at 65.  (Internal quotations and citations omitted).  The court continued with its explanation of the learned intermediary analysis:

> "However, mere compliance with regulations or directives as to warnings, such as those issued by the United States Food and Drug Administration here, may not be sufficient to immunize the manufacturer or supplier of the drug from liability. The warnings required by such agencies may be only minimal in nature and when

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-11-

the manufacturer or supplier knows of, or has reason to know of, greater dangers not included in the warning, its duty to warn may not be fulfilled."

*Id.*  Thus, if the doctrine without exception, *see* section III, B, *infra*, is still viable in California, then clearly the duty does run to the physician.  However, and critical to GSK's Motion, the California Supreme Court set forth a dispositive threshold requirement.  A dispositive requirement that GSK's Motion ignores.

Physicians cannot, and do not, actually become "learned" until they have received adequate warnings.  *Amore v. G.D.Searle & Co.*, 748 F.Supp. 845, 850 (S.D. Fla. 1990).  California is no different: for the physician to actually be "learned," an "adequate warning" of the dangers must be given to the physician. *Stevens, supra; Brown v. Superior Court,* 44 Cal.3d 1049, 1062 n.9 (Cal.1988)("It is well established that a manufacturer fulfills its duty to warn if it provides adequate warning to the physician."); *Carlin v. Superior Court,*13 Cal.4th 1104, 1116 (Cal.1996) citing *Stevens*; *Sherman v. Stryker Corp.*, 2009 WL 2241664, 4 (C.D.Cal.2009)(Citing *Stevens* and reaffirming the necessity of an adequate warning to the physician: "Rather, [*Stevens*] holds that certain warnings to the physician 'may not be sufficient to immunize the manufacturer or supplier of the drug from liability.'"); *Notmeyer v. Stryker Corp.*, 502 F.Supp.2d 1051, 1060 (N.D.Cal. 2007)(Because defendant manufacturer failed to carry their burden and cite evidence of an adequate warning, motion for summary judgment denied, "A medical product manufacturer fulfills its duty to warn of risks by providing adequate information to the physician.")(Internal citations omitted.); *Salyards ex rel. Salyards v. Metso Minerals Tamper OY*, 2005 WL 3021959, 9 (E.D.Cal. 2005)( "For example, a prescription drug manufacturer may usually discharge its duty to warn by providing warnings to the prescribing physician, a so-called 'learned intermediary.'"); *Martin v. Merck & Co.,*

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-12-

*Inc.*, 2005 WL 1984483, 4 (E.D.Cal. 2005)("California law exempts from liability those in the chain

of prescription drug distribution when adequate warning has been given to physicians about the

potential dangers of the medication."); *Black v. Merck & Co., Inc.*, 2004 WL 5392660, 4 n.5

(C.D.Cal. 2004)("Under the 'learned intermediary' doctrine, a drug manufacture has no duty to warn

the ultimate consumer, the patient, so long as adequate warnings are given to the doctor."); *Huntman*

*v. Danek Medical, Inc.*, 1998 WL 663362, 5 (S.D.Cal. 1998)(Although this examination of the

learned intermediary doctrine was in the context of the overpromotion exception, the court stated the

"critical inquiry" under the learned intermediary analysis was "whether the doctor was provided with

adequate warnings."); *Wendell v. Johnson & Johnson*, 2010 WL 271423, 3 (N.D.Cal. 2010)(In

denying prescription drug manufacturer's motion to dismiss based on learned intermediary doctrine,

the court stated, "However, this rule does not absolve manufacturers of a duty to provide physicians

with adequate warnings about drugs such that physicians can adequately inform their patients.");

*Evraets v. Intermedics Intraocular, Inc.*, 29 Cal.App. 4th 779, 793 (1994)(" The [California] courts

have held that a manufacturer's duty to warn is discharged by adequately advising the doctors who

prescribe a drug of its hazards.").

      Thus, because GSK has failed to plead and prove it gave Dr. Hudson a legally adequate

warning, it has failed to carry its burden under *Celotex, infra*, and as such, its Motion must fail.  It

has not met the threshold requirement as to its affirmative defense.  Moreover, and as made clear in

*Stevens*, GSK cannot simply rely upon the fact it had an FDA approved label at the time of Eric

Hornisher's prescription.  In light of *Tobin*, and as revealed by the FDA mandated subsequent

analysis of its own clinical trial data reflecting an increased risk, Exhibit 19, GSK had information

in hand reflecting an increased risk of suicide with Paxil prior to Eric's prescription.  Moreover,

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-13-

irregardless of what the FDA says, if the manufacturer knows, or has reason to know, of a greater danger and does not warn the physician, as is most certainly the case in this instance, the duty is not fulfilled.  For these reasons alone, GSK's Motion must fail.

**4.     An Adequate Warning Would Have Changed Dr. Hudson's Actions.**

Although Plaintiffs' believe the Court need not continue in its learned intermediary analysis, even if it should, GSK's Motion still fails.  Despite GSK's assertions that are contrary to the record and incomplete, an adequate warning could very well have saved Eric's life.

GSK's first factual contention that usurps the actual record and testimony is that Dr. Hudson was already aware of the risks "about which Plaintiffs claim."  *See* GSK's Motion at 7-8.  However, what GSK attempts to do, and what is intellectually dishonest, is blur the line between Dr. Hudson's awareness of suicide as a *risk of untreated depression* versus his actual understanding that Paxil *itself* can cause suicide.

First, at the time he prescribed Paxil to Eric Hornisher, Dr. Hudson did not believe Paxil caused suicide.  Exhibit 12 at 109:22-110:3.  However, he now believes it can in certain patients.  *Id*. at 110:4-111:14.  And more importantly, he distinctly believes it possibly played a role in Eric's death.  *Id*. at 98:16-17.[11]

Second, Dr. Hudson stated *ad nauseam* in his deposition that at the time he prescribed Paxil to Eric Hornisher, he did not think Paxil caused suicide.  As of April 14, 2004,

---

[11]  To be fair, Dr. Hudson also believes other factors contributed to Eric's suicide, but he clearly testified he now, unlike then, believes "it's possible that the Paxil played a role." Such judgments as to how much, if any, the other facts played a part in Eric's tragic death is distinctly within the province of the jury.

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-14-

> "In my own thinking, I did not have a connection between Paxil or any other antidepressant in terms of causing suicidal thinking or behavior.  In fact it took sometime to accept that, that might be the case or at least that there's evidence [of it]..."

Exhibit 12 at 146:10-147:5; *see also Id.* at 32:11-24;109:16-20; 138:13-23.  By his own admission, he did not "connect" in his own mind that Paxil could cause suicidality.  Moreover, his belief was the prevalent sentiment among psychiatrists, in that it was *not* that Paxil *itself* could cause suicide, but rather that any potential risk of suicide was tied to the underlying illness.  *Id*.

Dr. Hudson's testimony makes this a much different case than either *Plenger v. Alza Corp*., 11 Cal.App. 4th 349, 36 (1992) where the court upheld summary judgment because the harm was "universally known in the medical community," or *Plummer v. Lederle Labs*., 819 F.2d 349, 359 (2d Cir. 1987) where the prescribing physician testified he was aware of the actual risk.  Here, Dr. Hudson's testimony makes clear that within the psychiatric community, the risk was most certainly not universally known and that he did not become aware of any published links within the medical community until after Eric's death.   Exhibit 12 at 32:11-24; 106:17-107:21;146:10-147:5.  Moreover, he also unequivocally stated he did not understand Paxil to cause suicide until after Eric's death.  *Id.* at 109:22-110:3; 110:4-111:14.

Dr. Hudson also candidly admitted his "appreciation" back in 2004 for Paxil to cause certain side effects that are precursor conditions to the onset of suicidality, specifically distinct forms of agitation, was not what it is today.

> "Yeah, I don't believe that I fully appreciated at that time that agitation could contribute to suicidal behavior as much as I appreciate it currently."

*Id*. at 80:8-12.  He now believes this Paxil-induced agitation is a harbinger of suicide.

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-15-

Q:      And I think you told us, and correct me if I'm wrong, that at the time, it wasn't your belief that the agitation - - or agitation could contribute to the suicidal behavior?

A:      Right.

Q:      Do you feel differently now?

A:      I do.

*Id*. at 135:4-12-136:1.

What is striking in this case, and for purposes of causation, is that, shortly after starting Paxil, Eric specifically complained to Dr. Hudson about feeling "hot" and about an anxiety component that now included restlessness and agitation that was distinctly different in feeling to him.  *Id.* at 71:16-72:4; 134:3-135:3.  Now, unlike then, Dr. Hudson fully "appreciates" that these precursor conditions to suicide were Paxil related.  By his own admission, because he was not adequately warned, he did not appreciate the warning signs Eric was voicing to him.

Further, despite GSK's assertions to the contrary, in his conversation with the Hornisher's on April 14, 2004, Dr. Hudson clearly stated any reported risk of suicide was not linked to Paxil itself, but rather the underlying illness.

Q:      In this conversation you had with the Hornishers, this phone conversation on April 14, did you specifically tie any risk of suicide that you might have discussed to the actual use of Paxil?

A:      You know, as I said, this was all coming out right around this time. In my own thinking, I did not have a connection between Paxil or any other antidepressant in terms of causing suicidal thinking or behavior. In fact, it took sometime to come to accept that, that it might be the case or at least that there's evidence apparently to that fact as indicated by the black box warning.

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-16-

I know myself and my colleagues at the time felt that there just seemed to be a disconnect in our minds between antidepressants actually precipitating suicidal behavior.  We knew that they could be used as a means of suicide, particularly the older ones and if there was a risk of suicide and then– in people on antidepressants.  But as to the antidepressants making the person suicidal, there just didn't seem to be a connection.  So there was just this lot of smoke and fog right around this period of time that was being sorted through by myself and my colleagues in terms of what all this meant.  And that's what we were dealing with at the time.

*Id*. at 146:10-147:5.  Charles and Patricia Hornisher both confirmed that Dr. Hudson did not tie any potential for suicide to the use of Paxil itself.  Exhibit 6 at 230:13-231:10; Exhibit 7 at 172:12-173:23.  As is made clear by the sworn testimony of the only living individuals who participated in it, it is simply disingenuous to state Dr. Hudson knew at that time that Paxil could cause either suicide or an agitative component that resulted in suicide.

At the time of his prescription to Eric Hornisher, Dr. Hudson did not know that the use of Paxil either caused or contributed to suicidality.  He also did not believe there was any understanding within the psychiatric community or the medical literature linking the two.  As such, he was simply not aware of the risk and GSK's Motion should be denied.

**5.    Dr. Hudson was Aware of, and Relied Upon, GSK's Label When Prescribing Paxil to Eric Hornisher.**  GSK principally relies upon Pfizer's learned intermediary victory in *Motus v. Pfizer Inc*., 196 F. Supp 2d 954 (C.D. Cal. 2001) to carry the day on pages 8-10 of its Motion.  And assuming *arguendo* the Court gets this far into the analysis,[12] its not terribly surprising it would do so.  However, not only is this a much, much different case than *Motus*, but

---

[12]  To be clear, Plaintiffs believe that GSK's failure to plead and prove an adequate warning is dispositive and that no further inquiry is necessary.

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-17-

GSK's Motion and interpretation of the facts again pays short shift to what Dr. Hudson actually said and did.

In *Motus*, summary judgment was granted because the plaintiff "failed to adduce evidence that [the prescribing physician] would have acted differently had [the manufacturer] provided an adequate warning about the risk of suicide associated with the ingestion of [the drug]. *Id*. at 995. The record in this case reflects a much different picture. And in actuality, the case is much more akin to *Conte v. Wyeth, Inc.*, 168 Cal.App. 4th 89 (2008).

In *Conte*, Wyeth, like GSK, sought summary judgment via the learned intermediary doctrine. *Conte,* 168 Cal.App. 4th at 98. There, like here, Wyeth principally relied upon *Motus* to argue the Plaintiff could not prove causation. *Id.* at 99. There, like here, the manufacturer argued that the prescribing doctor did not rely upon the product warnings in making his treatment decision. *Id*. There, like here, the physician had not read the label immediately prior to prescribing the drug at issue but that he "probably" had read it.[13] *Id*. The court in distinguishing *Motus* and denying Wyeth's motion stated:

> "Conte produced evidence tending to show that Dr. Elsen had probably read the PDR entry for Reglan, believed it to be accurate, and generally would rely on the PDR when he considered prescribing Reglan to his patients. This evidence supports a reasonable inference that Wyeth's PDR product information was a causal factor in Dr. Elsen's decision to treat Conte with metoclopramide and raises a sufficient question of fact to defeat summary judgment on that ground."

*Id*.

---

[13]  In this case, Dr. Hudson affirmatively testified he not only had read the label, but that he also was distinctly familiar with the "precautionary" language regarding suicide contained in the then most recent label. *Id.* at 138:13-23.

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-18-

With the issue so framed, we now turn to what Dr. Hudson did in this case.  Although Dr. Hudson stated he did not read the most current label when he prescribed Paxil to Eric Hornisher, he did unequivocally testify that he was familiar with the information contained in the then most current label.  Exhibit 12 at 138:13-23.[14]  Thus, unlike in *Motus* where the prescriber testified he had *never* read the label prior to prescribing the medication, here Dr. Hudson clearly had.  *Motus*, 196 F.Supp 2d at 987.  Any argument that there is no causal connection between Plaintiffs' injuries and GSK's failure to warn based on any purported failure of Dr. Hudson to read the most current prescribing information is a nonstarter.  Dr. Hudson's testimony that he was familiar with the *precautionary* (vice warning)[15] language regarding suicide in effect at the time defeats GSK's argument.  Further GSK's incomplete recitation of deposition testimony and illogical leap on page 9 of its Motion is nothing more than an attempt to pigeon-hole the facts of this case to fit *Motus*.  As evidenced by how Dr. Hudson now specifically addresses the potential for Paxil to cause suicide with his patients and that he now believes Paxil could very well have played a role in Eric's death, an adequate warning could and would have changed Dr. Hudson's actions.

Moreover, when GSK argues that a more current label would make no difference in this case, it again ignores what Dr. Hudson actually said.  Dr. Hudson testified that he normally "depends"

---

[14]  Although the label Plaintiff's counsel handed Dr. Hudson, and of which Dr. Hudson was referring to in this testimony was not the most current one in effect at the time of Eric's prescription, the language regarding suicide contained in the label was the exact same.  The Court need only compare Exhibit 20 at 11 (Paxil Label to which Dr. Hudson was referring) and GSK's Ex. 1 at 8.  Thus, it is a distinction without a difference.

[15]  The label in effect at the time of Eric's death did not even mention suicide until page 8 under the "Precautions" heading.  GSK's Ex. 1 at 8.  Dr. Hudson acknowledged that the most current label discussing suicide in a **BLACK BOX** on page 1 is much more extensive and information he wants to be aware of.  Exhibit 12 at 116:6-117:23; 119:13-24.

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-19-

upon drug companies to send him letters alerting him to label changes. Exhibit 12 at 122:10-123:12. He further testified that he not only receives visits from pharmaceutical sales representative, but that he fully expects them to notify him of label changes. *Id*. He also relies upon the warning information contained in the label when making prescribing decisions as well as GSK sales representatives to be accurate and truthful about their medication. *Id*. Dr. Hudson's testimony again reflects that if he had been adequately warned, he would have paid attention and passed those warnings on.

Dr. Hudson, as any busy practitioner and prudent physician would do, consults multiple sources with regard to prescription medications. However, again, unlike the *Motus* physician, the sources Dr. Hudson did consult either down played any risk of Paxil-induced suicide (his psychiatric peers) or didn't mention it at all (medical literature of which he was familiar). GSK certainly did nothing to highlight the risk to him. In fact, GSK did not advise *any* physician of the March 22, 2004 label change regarding suicidality until after Eric's death. Exhibit 18.

Finally, unlike the *Motus* physician, the only thing unequivocal about Dr. Hudson's testimony is that today, unlike when he prescribed Paxil to Eric Hornisher, he believes not only that Paxil can cause suicide, but that it possibly played a role in Eric's death and that he currently warns his patients about Paxil's potential to cause suicide. As his current practice reflects, if he had been adequately warned, he would have discussed this issue with the Hornishers on April 14, 2004. And if he had done so, they would have sought a different medication. Furthermore, if he had been adequately warned he would also have been in a position, in his own words, to fully "appreciate" the warning

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-20-

signs of Paxil-induced suicide that Eric described to him on April 12, 2004.[16]  As Dr. Hudson stated,

if he knew of a specific risk of suicide to Paxil, he would "probably tend to consider other options."

Exhibit 12 at 128:8-22.  This tragedy could, and should have been averted.  It was not because GSK,

despite knowledge to the contrary, choose not to timely warn Dr. Hudson either via its label, its sales

representatives, or via "dear doctor" letter.

**B.    California's Likely Adoption of the RESTATEMENT (THIRD) Learned
Intermediary Exceptions Also Negates GSK's Motion.**  The learned intermediary doctrine was

first codified by the ALI in its 1998 RESTATEMENT (THIRD) OF TORTS, § 6(d).  The RESTATEMENT

(THIRD) articulation of the doctrine contains an important caveat, requiring a warning directly to "the

patient when the manufacturer knows or has reason to know that health-care providers will not be

in a position to reduce the risks of harm in accordance with the instructions or warnings" to the

prescribing physician.  RESTATEMENT (THIRD) OF TORTS, § 6(d)(2)(ALI, 1998).  Because the risk

of SSRI-induced violence and suicidality is most acute at the beginning of drug therapy and may (as

the facts in both *Tobin*,[17] *Motus*, and the case at bar illustrate) occur before the patient has an

opportunity to come back and see his doctor; and also because the FDA itself has realized that the

association between antidepressants like Paxil and increased suicidality (and its precursor, the

"activation syndrome") is most likely to occur early in drug therapy, a direct-to-consumer warning

---

[16]   This is the exact sort of evidence that the *Motus* court noted could prevent summary
judgment under the learned intermediary doctrine, and that was not produced by the plaintiffs in
*Motus*.  *Motus*, *supra* at 995.  It is clearly produced herein.

[17]   *Tobin, supra.*

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-21-

(in the form of a PMG) has been mandated. Given these facts, should California adopt the RESTATEMENT (THIRD) formulation, this case falls squarely within the exception.

Two other state courts of last resort have, in this Century, adopted the RESTATEMENT (THIRD) formulation of the doctrine. *Freeman v. Hoffman-La Roche, Inc.*, 618 N.W.2d 827, 842 (Ne. 2000)("We adopt § 6(d) of the Third Restatement"); *Larkin v. Pfizer, Inc.*, 153 S.W.3d 758, 770 (Ky. 2004)("now adopt RESTATEMENT (THIRD) OF TORTS: Products Liability § 6(d)).[18]

Is California likely to do the same? Existing precedent suggests that it will. California courts have a long tradition of looking with favor on the Restatements as persuasive authority. The basis and rational for doing so was long ago articulated by the California Supreme Court in *Canfield v. Security-First Nat. Bank of Los Angeles,* 13 Cal.2d 1, 30 -31 (Cal. 1939). Therein, the court offered the following:

> "Although it is true as urged by respondents that the restatement does not constitute a binding authority, considering the circumstances under which it has been drafted, and its purposes, in the absence of a contrary statute or decision in this state, it is entitled to great consideration as an argumentative authority. It purports to accurately reflect the general common law of the United States, and where there is a conflict, to state the general and better rule on any given subject."

*Id*. at 30-31.

And although RESTATEMENT (THIRD) OF TORTS § 6 has not been formally adopted to the best of counsel's knowledge, unsurprisingly California courts still look to the RESTATEMENT (THIRD) OF TORTS in products liability actions for guidance and with favor, especially with regard affirmative

---

[18]   A third employed the "direct-to-consumer" advertising exception. *Perez v. Wyeth Laboratories, Inc.*, 734 A.2d 1245 (N.J. 1999). Other writing courts have adopted a total of six different common law exceptions to the doctrine. *See Vitanza v. The Upjohn Co.*, 778 A.2d 829 (Conn. 2001).

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-22-

defenses.  *See e.g.*, *Taylor v. Elliott Turbomachinery Co., Inc.*, 171 Cal.App. 4th 564, 585 (2009)(Looking to § 5 for application of "components parts" defense in products liability action.); *Gonzalez v. Autoliv ASP, Inc.*, 154 Cal.App. 4th 780, 789 (2007)(Again relying upon § 5 for application of "components parts" defense in products liability action); *Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger Co.,* 129 Cal.App. 4th 577, 582 (2004)(§ 5 and the component parts doctrine.); *Boeken v. Philip Morris, Inc*., 2001 WL 1894403, 9 (Cal.Superior 2001)(Citation to § 2 as authority in design defects case) and *Jimenez v. Superior Court*, 29 Cal.4th 473, 487 (2002)(In his concurring opinion, Justice Kennard specifically articulated he would follow the U.S. Supreme Court and adopt certain sections of the RESTATEMENT (THIRD) OF TORTS outright.).  Moreover, the California Supreme Court has already articulated adoption of the "overpromotion" exception to the learned intermediary rule.  *Stevens*, *supra*, 9 Cal.3d at 65.  *See also Brown, supra* at 1062; *Carmichael v. Reitz,* 17 Cal.App.3d 958, 989 (1971).

Toward that end, and with regard to this case, in late 2004, the FDA realized that warnings to physicians about the risks of antidepressant-induced suicidality – even warnings in bold print and BLACK BOXES – was not enough.  *Patients* needed their own warnings.  And the FDA regulations provided for them.  21 C.F.R. § 208.

The record in this case demonstrates this necessity.  Both Eric Hornisher and his parents were expressing concern over not only the medication choice, but also the side effects Eric was experiencing.  And consistent with the history of the Paxil/suicide controversy, the available scientific evidence to date, and the PMG itself, the initial period of drug therapy is *the danger period* for drug-induced suicidality scientific.  *See Tobin, infra*; Exhibit 14.  It is in this time period, when

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-23-

the patients' bodies and minds are becoming acclimated to the medicine, that they are vulnerable to quantum increases in anxiety and/or agitation and to sudden, uncontrollable, suicidal urges.

From 1990, when the issue of SSRI-induced suicidality first arose, through its 2006 Dear Doctor Letter, GSK adamantly refused to accept the notion that Paxil increases the risk of suicide for anyone.  Exhibit 19.  All of that changed in May 2006 when GSK issued a "Dear Healthcare Professional" letter that described a 6.7 fold increased risk of suicidal behavior for adult patients taking Paxil.  *Id.*  Although the principal focus was on patients in Eric Hornisher's age group, it further provided the risk may well extend beyond patients over the age of 24.  *Id.*  Indeed, it was this exact risk that the FDA later identified as statistically significant in its November 2006 findings for *all* adult patients taking Paxil.

This acknowledgment of risk must be juxtaposed with the testimony of Dr. Hudson and the facts of this case to see whether the RESTATEMENT exception applies.  Eric Hornisher, like most victims of Paxil-induced suicidality, killed himself within a scant two weeks of starting Paxil, *i.e.,* well within the window/danger period identified by the FDA and now acknowledged by Dr. Hudson. He was specifically voicing concerns about Paxil side effects that are now known to be harbingers of Paxil-induced suicidality.  Exhibit 12 at 71:16-72:4.  Although Dr. Hudson tried to address the Hornisher's concerns, he was neither adequately warned, nor in a position to provide adequate protection against the dangers of Paxil-induced suicidality.  Therefore, under these facts, the RESTATEMENT exception applies, and GSK's motion should be denied.

## IV.    CONCLUSION.

For all the reasons set forth above, Plaintiffs respectfully request the Court deny GSK's Motion for summary judgment.  GSK has simply failed to carry its burden as it neither proved the

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-24-

adequacy of the warning to Dr. Hudson nor that a different warning would not have changed his

actions.  In fact, just the opposite is born out in Dr. Hudson's testimony.  If he had been adequately

warned, the untimely and premature death of Eric Hornisher could have been averted.  Alternatively,

because California is likely to adopt and/or apply the RESTATEMENT (THIRD) OF TORTS with its

exceptions requiring a warning directly to the patient, and as no such warning was in place, GSK's

motion must also fail.

Respectfully submitted,

VICKERY, WALDNER & MALLIA, LLP

*/s/ Fred H. Shepherd*
Arnold Anderson (Andy) Vickery
Texas Bar No. 20571800
Fred H. Shepherd
Texas Bar No. 24033056
One Riverway, Suite 1150
Houston, TX 77056-1920
Tel: 713-526-1100
Fax: 713-523-5939
Email: andy@justiceseekers.com
Email: fred@justiceseekers.com
(Shepherd Admitted *Pro Hac Vice*)

## Certificate of Service

I certify that on this 10th day of February, 2010, Plaintiffs' Response in Opposition to GSK's Motion for Summary Judgment has been electronically filed with the Clerk using the CM/ECF system, which will automatically send email notifications of such filing to the following attorneys of record:

Donald F. Zimmer, Jr., Esq.
Cheryl A. Sabnis, Esq.
Kendra L. Pavkovic, Esq.
KING & SPALDING, LLP
Four Embarcadero Center, Suite 3500
San Francisco, CA  94111

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

VICKERY, WALDNER & MALLIA, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-25-

1

David Norden, Esq.
King & Spalding, LLP
1180 Peachtree Street NE
Atlanta, GA  30309

2

3

4

/s/ Fred H. Shepherd
Fred H. Shepherd

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Plaintiffs' Response in Opposition to
GSK's Motion for Summary Judgment
Case #4:09-cv-01453-PJH

Vickery, Waldner & Mallia, LLP
One Riverway, Suite 1150
Houston, Texas 77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939

-26-

27

28