DONALD F. ZIMMER, JR. (State Bar No. 112279)
CHERYL A. SABNIS (State Bar No. 224323)
KENDRA L. PAVKOVIC (State Bar No. 256729)
KING & SPALDING LLP
101 Second Street
Suite 2300
San Francisco, CA 94105
Telephone:  (415) 318-1200
Facsimile:  (415) 318-1300
Email: fzimmer@kslaw.com
        csabnis@kslaw.com
        kpavkovic@kslaw.com

DAVID F. NORDEN (Admitted *Pro Hac Vice*)
KING & SPALDING LLP
1180 Peachtree St., N.E.
Atlanta, GA 30309-3521
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
Email:  dnorden@kslaw.com

Attorneys for Defendant
GLAXOSMITHKLINE LLC (formerly known as
SMITHKLINE BEECHAM CORPORATION d/b/a
GLAXOSMITHKLINE)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(OAKLAND DIVISION)

| | |
|---|---|
| CHARLES HORNISHER and PATRICIA HORNISHER Individually and as Personal Representatives of the Estate of ERIC JOHN HORNISHER, Deceased, <br><br> Plaintiffs, <br><br> v. <br><br> ELI LILLY and COMPANY; SMITHKLINE BEECHAM CORP. d/b/a GLAXOSMITHKLINE; and JOHN DOES 1-50, <br><br> Defendants. | Case No. 4:09-cv-01453-PJH <br><br> **REPLY IN SUPPORT OF DEFENDANT GSK'S MOTION FOR SUMMARY JUDGMENT** <br><br><br> **Date:  March 3, 2010** <br> **Time:  9:00 a.m.** <br> **Room: 3rd Floor, Courtroom 3** <br> **Judge: Honorable Phyllis J. Hamilton** |

# TABLE OF CONTENTS

I.    **DISCUSSION** ..................................................................................................1

    A.    The Learned Intermediary Doctrine Is Part And Parcel Of Plaintiffs' Alleged Failure to Warn Claims Against GSK -- Not An Affirmative Defense That Must Be Separately Pled and Proved. ..................................................... 1

    B.    To Prevail On Summary Judgment, GSK Need Only Demonstrate That Plaintiffs Cannot Prove Causation – An Essential Element of Their Claims. ........ 2

        1.    Plaintiffs Cannot Credibly Dispute That Dr. Hudson Knew Of A Reported Risk Of Suicide Associated With Paxil When He Prescribed Paxil To Mr. Hornisher. .................................................................................... 3

        2.    Plaintiffs' Guesses About What *Might* Have Happened Had Dr. Hudson Read The Operative Labeling When Prescribing Paxil *Cannot* Be Used To Defeat Summary Judgment. ................................................................. 5

            a.    *Conte v. Wyeth, Inc.* Does Not Support Denial Of Summary Judgment In This Case. ................................................................. 9

    C.    California Law Has Not Rejected The Learned Intermediary Doctrine In Favor Of The Restatement (Third) of Torts. ........................................................ 10

II. CONCLUSION ..................................................................................................10

TABLE OF AUTHORITIES

## Cases

*Ackermann v. Wyeth Pharms., Inc.,*
   526 F.3d 203, 211 n.12 (5th Cir. 2008)……………………………………………………7

*Acumed LLC v. Advanced Surgical Servs.*
   561 F.3d 199 (3d Cir. 2009) .................................................................................. 6

*Argyropoulos v. City of Alton*
   539 F.3d 724 (7th Cir. 2008) ................................................................................. 7

*Box v. A&P Tea Co.*
   772 F.2d 1372 (7th Cir. 1985), *cert. denied* 478 U.S. 1010 (1986) ................................ 6

*Carlin v. Superior Court*
   13 Cal.4th 1104 (1996) ........................................................................................... 1

*Conte v. Wyeth, Inc.,*
   168 Cal.App.4th 89 (2008)……………………………………………………………3, 9

*Fairbank v. Wunderman Cato Johnson*
   212 F.3d 528 (9th Cir. 2000) ................................................................................. 9

*Huntman v. Danek Med., Inc.*
   1998 WL 663362 *1, at *4 (S.D. Cal. July 24, 1998) .............................................. 2

*Khan v. Shiley Inc.,* 217 Cal.App.3d 848 (1990) ................................................................ 2

*Latiolais v. Merck & Co.*
   302 Fed.Appx. 756 (9th Cir. 2008) .................................................................. 5, 6

*Motus v. Pfizer, Inc.*
   196 F.Supp.2d 984 (C.D. Cal. 2001), *affirmed* 358 F.3d 659 (9th Cir. 2004) ........................ 1, 2

*O.S.C. Corp. v. Apple Computer, Inc*
   792 F.2d 1464 (9th Cir. 1986) ............................................................................... 6

*Plenger v. Alza Corp.*
   11 Cal.App.4th 349 (1992) ................................................................................. 3, 4

*Plummer v. Lederle Labs.*
   819 F.2d 349 (2d Cir. 1987) ................................................................................. 4

*Ramirez. v. Plough, Inc.,* 6 Cal.4th 539 (1993) .................................................................. 2

*Stevens v. Parke, Davis & Co.*
   9 Cal.3d 51 (1973) ................................................................................................ 1

*Villiarimo v. Aloha Island Air, Inc.*
   281 F.3d 1054, n. 10 (9th Cir. 2002) ...................................................................... 6

*Whiteley v. Philip Morris, Inc.,* 117 Cal.App.4th 635 (2004) ............................................ 2

ii

**Federal Regulations and Federal Register**

44 Fed. Reg. 37,434 at 37,448 (June 26, 1979))……………………………………………………………… 7

63 Fed. Reg. 66,378 at 66,384 (December 1, 1998)...…………………………………………………… 7

21 C.F.R. 208.1…………………………………………………………………………………………………8

**Other Authorities**

Restatement (Third) of Torts, 6(d)(2) ................................................................................ 10

1    GSK's motion set forth two *independent* reasons why summary judgment for lack of

2    causation should be entered.  First, GSK asserted that summary judgment is appropriate because Dr.

3    Hudson admitted he had prior knowledge of a reported risk of suicide associated with Paxil use and

4    prescribed Paxil anyway.  Plaintiffs' opposition relies upon speculation and fails to demonstrate to

5    the contrary.

6        Second, GSK asserted that summary judgment is also appropriate because Dr. Hudson did

7    *not* rely upon the operative labeling when prescribing Paxil to Mr. Hornisher.  Contrary to Plaintiffs'

8    assertions, there remains no causal connection between the operative labeling and Dr. Hudson's

9    decision to prescribe Paxil..

10       Plaintiffs' failure to provide legal argument or citation to evidence demonstrating a dispute of

11   material fact as to *either* of these grounds requires entry of summary judgment for GSK.  GSK's

12   motion should be granted.

13   I.   **DISCUSSION**

14        A.   **The Learned Intermediary Doctrine Is Part And Parcel Of Plaintiffs'
               Alleged Failure to Warn Claims Against GSK -- Not An Affirmative
15             Defense That Must Be Separately Pled and Proved.**

16       The California Supreme Court has long ruled that the learned intermediary doctrine is well-

17   established law in California.  *See, e.g., Carlin v. Superior Court*, 13 Cal.4th 1104, 1116 (1996);

18   *Stevens v. Parke, Davis & Co.*, 9 Cal.3d 51, 65 (1973)**.**  The doctrine describes a pharmaceutical

19   company's duty to warn of the risks associated with the use of a prescription drug.  *Id.*  Contrary to

20   Plaintiffs' assertions, the learned intermediary doctrine does *not* represent an affirmative defense that

21   GSK must affirmatively plead and prove.[1]  *See* Opposition ("Opp."), 11:1-14.

22       Additionally, California does not recognize a rebuttable "heeding presumption" regarding

23   prescription pharmaceutical failure to warn claims that GSK must overcome to obtain summary

24   judgment.  *See Motus v. Pfizer, Inc.*, 196 F.Supp.2d 984, 994 (C.D. Cal. 2001), *affirmed* 358 F.3d

25   659 (9th Cir. 2004) (granting summary judgment to an SSRI manufacturer and declining to apply a

26   heeding presumption because ***no court applying California law in the context of a pharmaceutical***

27   ───────────────
              [1] GSK includes the learned intermediary doctrine among its stated affirmative defenses out of an
28   abundance of caution to avoid a later claim that GSK has somehow waived its right to rely upon the doctrine.

1

1   *failure to warn case had done so* (emphasis added)).

2       Because California does not apply a heeding presumption, Plaintiffs bear the burden of

3   proving that the prescribing decision in this case would be different had a different warning been

4   provided.  *See Motus, supra,* 196 F.Supp.2d at 997 (given that case was about the sufficiency of the

5   warnings accompanying Zoloft, plaintiff's counsel should have asked whether the physician would

6   have prescribed Zoloft had the package insert contained a warning that Zoloft can cause an increased

7   risk in suicide during the first few weeks of drug treatment; because plaintiff did not ask this

8   question, summary judgment for defendant was appropriate).  Like the *Motus* plaintiff, Plaintiffs

9   here failed ask Dr. Hudson whether he would have prescribed Paxil had the package insert contained

10  a warning that Paxil can cause an increased risk in suicide during the first few weeks of drug

11  treatment.  Without affirmative testimony from Dr. Hudson on this point, they cannot prevail on

12  their claims against GSK.

13       **B.     To Prevail On Summary Judgment, GSK Need Only Demonstrate That
                  Plaintiffs Cannot Prove Causation – An Essential Element of Their Claims.**
14

15       Causation is an essential element of each of the Plaintiffs' claims.  *See* Motion, 6:25-7:6

16  (*citing Khan v. Shiley Inc.,* 217 Cal.App.3d 848, 855 (1990) (causation is essential element to

17  products liability action no matter what theory of recovery is utilized); *Whiteley v. Philip Morris,*

18  *Inc.,* 117 Cal.App.4th 635, 696 (2004); *see also Motus, supra,* 196 F. Supp. 2d at 986, 999 (finding

19  no conceivable causal connection between the representations or omissions that accompanied the

20  product and plaintiff's injury); *Ramirez. v. Plough, Inc.,* 6 Cal.4th 539, 556 (1993) (same)).  It is a

21  well-established principle under California law that where a plaintiff cannot prove that an inadequate

22  warning *caused* her injuries, it is irrelevant whether or not a drug manufacturer provided an adequate

23  warning to the prescribing physician or anyone else for that matter.[2]  *See Motus, supra,* 196

24  F.Supp.2d at 996, 999 (physician did not read labeling information until after decedent's suicide);

25  *Huntman v. Danek Med., Inc.,* 1998 WL 663362 *1, at *4 (S.D. Cal. July 24, 1998) (granting

26  summary judgment to a manufacturer in a medical device failure to warn case because the doctor did

27

28       _____
         [2] Plaintiffs spend many pages of their opposition on this irrelevant point.  *See* Opp., 11:15-14:3.

REPLY I/S/O DEF. GSK'S MOTION FOR SUMMARY JUDGMENT                    CASE NO. 4:09-cv-01453-PJH

not rely on any statements by manufacturer in deciding to perform treatment); *Conte v. Wyeth, Inc.,* 168 Cal.App.4th 89, 99-100 (2008).

> **1.    Plaintiffs Cannot Credibly Dispute That Dr. Hudson Knew Of A Reported Risk Of Suicide Associated With Paxil When He Prescribed Paxil To Mr. Hornisher.**

As more fully discussed in GSK's opening brief, a manufacturer has no duty to warn of a risk that is independently known and apparent to the physician.  *See* Motion, 7:7-8:4 (*citing, inter alia, Plenger v. Alza Corp.*, 11 Cal.App.4th 349, 362 (1992) (holding that no authority exists that requires a manufacturer to warn of a risk that is known to the physician)).  Here, Dr. Hudson's records and testimony unequivocally demonstrates that he *was aware* of a reported *risk of suicide* associated with Paxil use *at the time he treated Mr. Hornisher with Paxil.  See* Hudson Dep., 74:12-79:20. Specifically, on April 14, 2004, Eric Hornisher and Plaintiffs had a phone conference with Dr. Hudson where Mr. Hornisher's mother (Plaintiff Patricia Hornisher) "raised risk of suicide she had seen on Internet on Paxil."  *Id.* at 74:2-20; Pavkovic Dec. Ex.1 at 00007-8.  As he had told Mr. Hornisher before, Dr. Hudson told Mrs. Hornisher "this was a reported risk but it was greater in untreated depression" and then discussed "possible warning signs" with the family.  *Id.*  Dr. Hudson testified further about his knowledge of this risk later in his deposition:

| | |
|---|---|
| **Counsel:** | In your note of April 14th, 2004, you indicated that the mother raised risk of suicide she had seen on Internet on Paxil.  Can you tell me any more about what she was concerned about? |
| **Dr. Hudson:** | Just that.  As I say, this was when all of this news was breaking.  And I was still struggling what to make of it myself. So I indicated that this was a -- apparently a reported risk with antidepressant medication.  I didn't consider it specific to Paxil in my own mind, but that it was a risk within antidepressant medication and -- but that not treating depression is more risky. |
| **Counsel:** | In terms of suicide? |
| **Dr. Hudson:** | Yes. |
| **Counsel:** | And when you say risk with antidepressant medication, do you mean only SSRIs or SSRIs and other types of antidepressants? |
| **Dr. Hudson:** | This was all just coming out about SSRIs at that point in time, so that was mainly my -- my thinking at that point. |

3

Hudson Dep., 78:6-19.  In addition to discussing this reported risk associated with Paxil and other SSRIs, Dr. Hudson testified that he told Mr. Hornisher and Plaintiffs what to watch for to determine whether Mr. Hornisher is becoming suicidal, including "agitation."  *Id.* at 79:1-81:9; *see also* C. Hornisher Dep. 161:7-162:5.  In fact, the warnings he currently gives to patients today regarding Paxil (which he still prescribes,[3] *see* Hudson Dep., 17:4-13, 34:1-14) are the same warnings that he gave to Eric Hornisher and the Plaintiffs regarding Paxil.  Hudson Dep., 27:6-28:3.  Dr. Hudson testified that he has *not* modified any instructions or warnings that he gives to patients based on his experience with Eric Hornisher.  *Id.* at 35:15-18.

In their opposition, Plaintiffs try to confuse the issue arguing that, instead of knowledge of a *reported risk,* the physician must have independently concluded that there is a direct *causal* relationship between a product and a particular outcome before this rule applies.  *See* Opp., 15: 8-18.  Knowledge of "general causation" and "reported risk" are very different things, *i.e.*, knowledge that a negative outcome has been reported in conjunction with use of a product does not mean that the product in fact caused (or even can cause) the negative outcome.  ***All that is required is that the prescribing physician be aware of the "risk." See Plenger,*** 11 Cal.App.4th at 362 (knowledge of "risk of death" from untreated infection); *Plummer v. Lederle Labs.*, 819 F.2d 349, 358 (2d Cir. 1987) (knowledge of "risks that may follow" polio vaccination).

Plaintiffs also erroneously claim that Dr. Hudson was somehow not aware of the reported risk of suicide with Paxil when he was treating Mr. Hornisher and that his "understanding of any risk of suicide was tied to the mental illness and not that Paxil itself could cause suicide."  *See* Opp., 6:1-2.  The record tells a different story.  Indeed, the portion of Dr. Hudson's deposition to which Plaintiffs' cite has *nothing* to do with his admitted independent knowledge of a risk of suicide with Paxil use.[4]  *See* Opp., 6:1-2 (*citing* Hudson Dep., 138:13-23).

---

[3] Dr. Hudson continues to prescribe Paxil, as well as other SSRIs, to his patients, and further testified that SSRIs are "clearly safer" than other antidepressants such as TCAs.  Hudson Dep., 18:17-19:9.  In Dr. Hudson's view, SSRIs are among the anti-depressants he almost always starts with when deciding what to prescribe to a patient who has not previously been on many medications previously "because they are safer" and have "fewer side effects."  *Id.* at 21:13-20.

[4] Plaintiffs misconstrue Dr. Hudson's testimony claiming that (at pages 106:17-107:21 of his deposition) Dr. Hudson said that it was not until *after* Mr. Hornisher's death that he became aware of "links being made in the medical literature regarding Paxil's ability to cause suicidality in the early stage of

4

2.   **Plaintiffs' Guesses About What *Might* Have Happened Had Dr. Hudson Read The Operative Labeling When Prescribing Paxil *Cannot* Be Used To Defeat Summary Judgment.**

The Ninth Circuit recently affirmed summary judgment for a pharmaceutical manufacturer regarding an alleged failure to warn of a risk of suicide.  *See Latiolais v. Merck & Co.*, 302 Fed.Appx. 756, 757 (9th Cir. 2008).  In *Latiolais,* grant of summary judgment for the defendant manufacturer was based upon the prescriber's deposition testimony, which indicated that the drug inserts accompanying the product did not play a role in his decision to prescribe that medication to the decedent.  302 Fed.Appx. at 757.  The Ninth Circuit rejected Plaintiffs' attempts to rely upon hypothetical questions to defeat summary judgment, holding that Plaintiffs' questions regarding a supposed warning of suicide risk associated with the product "[came] into play only after one makes several assumptions on issues that include whether [the manufacturer] was obligated to issue a suicide risk warning for [the product], whether [the prescriber] would have read or heeded such a warning, and what information [the patient] would have disclosed to [the prescriber] with respect to his mental state."  *Id.*

Here, Dr. Hudson was unequivocal that he did not consult the operative labeling for Paxil at any time when deciding to prescribe Paxil to Mr. Hornisher.  Hudson Dep., 54:5-14.  In fact, he *never* consulted the labeling in relation to his treatment of Mr. Hornisher.  *Id*. at 54:5-14, 69:19-70:8, 72:20-25, 74:2-25, 99:6-15.  The operative label could have contained any number of hypothetical warnings about Paxil and risk of suicide.  Ultimately, it is irrelevant what warnings the operative Paxil labeling contained because Dr. Hudson testified that *he did not consult it* relative to his treatment of Mr. Hornisher.  *Id*. at 54:5-14, 69:19-70:8, 72:20-25, 74:2-25, 99:6-15.  Rather, his decision to prescribe Paxil to Mr. Hornisher was based upon information from other sources, including largely his own experience with Paxil.  *Id*. at 16:23-17:5, 19:10-16; 20:12-21:1, 24:2-17,

---

treatment," and that "[h]e didn't become are of published links in the medical community until after Eric's death."  Opp., 6:18-22; 15:14-16.  The question asked, however, was whether or not Dr. Hudson read any articles or other materials that drew a link between Paxil or SSRIs and suicide *after Eric's death* -- Dr. Hudson was not asked to state the date/time that he *first* read such materials (as Plaintiffs suggest in their Opposition).

52:8-54:14.

As with, the plaintiff's opposition in *Latiolais*, Plaintiffs' opposition here is founded upon hypothetical assumptions (and *not* unequivocal testimony) all of which must be assumed true for Plaintiff to defeat summary judgment.

- **The Court is asked to assume that that the current labeling somehow would have caused Dr. Hudson not to prescribe Paxil to Mr. Hornisher in April 2004.** Dr. Hudson admits that *he still prescribes Paxil to some of this patients.* Hudson Dep., 17:4-13, 34:1-14.[5] Obviously, the current warnings -- which Plaintiffs apparently contend are the warnings that should have been given to Dr. Hudson when he prescribed Paxil to Mr. Hornisher (*see, e.g.,* Opp., 7:9-8:2), -- *have not deterred Dr. Hudson from prescribing Paxil or any other SSRIs to his patients.* Yet, Plaintiffs ask the Court to defeat summary judgment based upon hypothetical assumptions that (1) Dr. Hudson would have read such warnings when he prescribed Paxil to Mr. Hornisher; and (2) would have decided not to treat Mr. Hornisher with Paxil because of the warning. Such assertions amount to pure guesswork which is insufficient to defeat summary judgment.[6] *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 n. 10 (9th Cir. 2002) (at summary judgment, a court need not draw all possible inferences in plaintiff's favor, but only all reasonable ones, and a reasonable inference is one based on more than more speculation, conjecture, or fantasy (*citing O.S.C. Corp. v. Apple Computer, Inc.,* 792 F.2d 1464, 1466-1467 (9th Cir. 1986) ("We scrutinize the evidence and reasonable inferences to determine whether there is sufficient probative evidence to permit 'a finding in favor of the opposing party based on more than mere speculation, conjecture, or fantasy.'")).[7]

---

[5] The deposition ("Dep.") pages cited in this reply have been attached to the Declaration of Kendra Pavkovic submitted contemporaneously herewith.

[6] Plaintiffs admit their assertions are wholly speculative when they say, "an adequate warning in this case *would probably (and perhaps presumptively)*, have saved Eric's life." Opp., 2:2-4 (emphasis added).

[7] *See also Acumed LLC v. Advanced Surgical Servs.*, 561 F.3d 199, 228 (3d Cir. 2009)(speculation and conjecture may not be used to defeat a motion for summary judgment) (citation omitted); *Box v. A&P Tea Co.*, 772 F.2d 1372, 1378 (7th Cir. 1985), *cert. denied* 478 U.S. 1010 (1986) ("conjecture, speculation,

- **The Court is asked to assume that GSK was required in April 2004 to provide the current labeling, which includes a "black box" warning and a Patient Medical Guide (PMG) regarding suicide.** Plaintiffs' own opposition undermines this proposed hypothetical. Specifically, their "chronology" of Paxil's labeling history states that (1) a "black box" warning regarding Paxil and risk of suicide was not required until early 2005 -- nearly a year after Dr. Hudson treated Mr. Hornisher (Opp., 10:1-3); and (2) that a PMG regarding suicide was not required until at least "early 2005" (Opp., 10:3-6).[8] Plaintiffs provide no support for their assertion that these warnings should have been provided earlier than they were actually required. First, as the United States Court of Appeals for the Fifth Circuit recently noted, a "black box" warning is only permitted when it is required by the FDA. *See Ackermann v. Wyeth Pharms., Inc.*, 526 F.3d 203, 211 n.12 (5th Cir. 2008) (*citing* Labeling and Prescription Drug Advertising: Content for Format for Labeling for Human Prescription Drugs, 44 Fed. Reg. 37,434 at 37,448 (June 26, 1979)). Here, Plaintiffs cannot dispute that FDA did not require a "black box" warning for any alleged risk of suicidality for Paxil (or any other SSRI) in April 2004. Second, FDA makes clear that "the written patient medication information provided does not alter the duty, or set the standard of care for manufacturers, physicians, pharmacists, and other dispensers," and that "[h]ealth care professionals bear the primary responsibility for informing individuals about patient-specific benefits, risks, and directions for using prescription medication." *See* Pavkovic Dec. Ex. 5, 63 Fed. Reg. 66,378 at 66,384 (Dec. 1, 1998). Medication guides do not operate as an exception to, or a

references to matters outside the [affiant's] personal knowledge, conclusory statements and bare assertions of the general truth of a particular matter will not suffice to withstand a properly supported motion for summary judgment"); *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (the nonmoving party must point to specific facts showing that there is a genuine issue for trial; inferences relying on mere speculation or conjecture will not suffice).

[8] In a separate brief that the Hornishers' counsel submitted to the Fifth Circuit Court of Appeals, counsel avers that it was not until October 2004 that the FDA mandated the distribution of a Paxil PMG. *See* Pavkovic Dec. Ex. 2 at page 19 fn 20, Brief for Appellants submitted in the matter of *Allgood v. Smithkline Beecham Corporation d/b/a Glaxosmithkline*, U.S. Court of Appeals for the Fifth Circuit Case No. 08-30329.

7

surrogate for, the learned intermediary doctrine.  *See id.*  Finally, a PMG is only for "selected medications" as "determined" by FDA.  21 CFR 208.1.  There is no evidence that FDA made any determination that Paxil required a PMG in 2004.

- **The Court is asked to assume that Mr. Hornisher in fact disclosed to Dr. Hudson all relevant information with respect to his mental state.**  Plaintiffs' opposition concedes that before starting Paxil Mr. Hornisher had been a fairly high functioning individual who went downhill very quickly in the months *before* he saw Dr. Hudson and *before* he was prescribed Paxil.  *See* Opp., 14:18 fn. 11(*citing* Hudson Dep., 98:16-17); *see* Hudson Dep., 98:6-11 (attributing Mr. Hornisher's suicide to a combination of things, including *inter alia* "the devastation of a collapse…of his personality and […] his sense of self after having a psychotic episode" and "failure at his very first attempt to put his many years of education to work for him and to be independent and on his own").  When asked whether he believed that Mr. Hornisher was telling him everything, Dr. Hudson himself testified:

> **Well, I'm certain I didn't know the whole story.**  I only saw him one time.  And the amount of time is limited.  One never gets the whole story in an hour.  I don't feel Eric lied to me.  Whether he told me everything or not, I can't say.  It's very common for more to come out as the patient -- you know, he didn't know me from Adam.  **I mean, I think it would be entirely reasonable that he wouldn't tell me everything.  That would be almost expected.**  But I don't think he was dishonest.

Hudson Dep., 99:19-100:3 (emphasis added).

Plaintiffs' arguments against summary judgment are based almost entirely on the above assumptions -- none of which is supported by the record.  Speculation and guesswork such as this is inappropriate and cannot be used as a tool to defeat summary judgment.  The facts are undisputed that Dr. Hudson did not consult the operative Paxil label when he prescribed Paxil to Mr. Hornisher and -- despite the warnings in the existing label -- Dr. Hudson *still prescribes Paxil to some of his patients.*  There is no evidence that additional warnings would have made any difference to the prescribing decision in this case.

8

### a.   *Conte v. Wyeth, Inc.* **Does Not Support Denial Of Summary Judgment In This Case.**

Plaintiffs contend that this Court should deny GSK's motion for summary judgment because the California Court of Appeal (First Appellate District) overturned a state superior court's grant of summary judgment to Wyeth in *Conte v. Wyeth, Inc.*, 168 Cal.App.4th 89 (2008). *Conte*, however, invokes a *state* summary judgment standard wholly inapplicable to this case. Indeed, the *state* standard applied in *Conte* required Wyeth to "show that ***under no possible hypothesis*** within the reasonable purview of the allegations of the complaint is there a material question of fact which requires examination by trial." 168 Cal.App.4th at 96. This is not the summary judgment standard as provided under the Federal Rules of Civil Procedure. *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000) (holding that the California summary judgment standard is different from the standard under Fed.R.Civ.P. 56, which permits a moving defendant to shift the burden of producing evidence to the nonmoving plaintiff merely by pointing out through argument the absence of evidence to support plaintiff's claim, whereas California law requires some evidence that the nonmoving plaintiff cannot meet its burden"). That the California Court of Appeal reversed the superior court's grant of summary judgment on state procedural grounds does not require denial of summary judgment here.

Moreover, the facts of *Conte* are very different than the facts here. In *Conte,* the physician provided a declaration claiming that he did *not* rely upon the PDR when prescribing Reglan (the drug at issue) to the plaintiff. *Conte, supra,* 168 Cal.App.4th at 99. But, the *Conte* physician later contradicted this testimony at deposition, stating "that the PDR was one of the sources he generally refers to in his clinical practice when he considers prescribing Reglan for his patients." *Id.* This contradictory testimony was held to be sufficient to defeat summary judgment under California's state law summary judgment standard. Here, we have no contradictory testimony to contend with: Dr. Hudson testified that he did *not* consult the Paxil labeling when he prescribed Paxil to Mr. Hornisher and that testimony remains unrefuted. Hudson Dep., 54:5-14. Unlike the *Conte* plaintiffs, Plaintiffs here have no evidence that the operative labeling for Paxil played any role in Dr. Hudson's decision to prescribe Paxil to Mr. Hornisher.

Plaintiffs repeatedly assert that Dr. Hudson testified that he would have acted differently if a different warning had been provided in the label. *See* Opp., 16:13-14 and 20:23-21:2. Plaintiffs fail to provide any citation to support these assertions because Dr. Hudson never said any such thing at his deposition. Dr. Hudson provided no testimony that a different label would have affected his treatment of Eric Hornisher one way or another. Moreover, because he did not read the operative label at the time he prescribed Paxil to Mr. Hornisher, anything the operative label might have said is irrelevant: The operative label bore no part in Dr. Hudson's decision to prescribe Paxil.

### C.   California Law Has Not Rejected The Learned Intermediary Doctrine In Favor Of The Restatement (Third) of Torts.

Plaintiffs invite the Court to make new California law by adopting the direct-to-consumer exception as stated in section 6(d)(2) of the Restatement (Third) of Torts and applying it to the facts of this case. As Plaintiffs' opposition acknowledges, Section 6(d) of the RESTATEMENT (THIRD) OF TORTS is not presently the law in California. *See* Opp., 22:1-3. Plaintiffs cite to no authority demonstrating that California has, might or will adopt the direct-to-consumer exception as stated in section 6(d)(2) of the Restatement (Third) of Torts. The fact that other sections of other restatements have been cited favorably by California courts, does not render it more likely than not that California would adopt Section 6(d) of the RESTATEMENT (THIRD) OF TORTS.

Even assuming this was the law in California, Plaintiffs fail to cite to any evidence that the rationale behind the direct-to-consumer exception adopted by Section 6(d) of the RESTATEMENT (THIRD) OF TORTS applies to the facts of this case. Plaintiffs' opposition does not claim that GSK overpromoted Paxil. Moreover, there is no evidence that Mr. Hornisher was exposed to any advertising for Paxil, much less that it influenced any decision by him to take Paxil.

## II.   CONCLUSION

For the reasons set forth above, GSK respectfully requests that the Court grant its motion for summary judgment and dismiss Plaintiffs' Complaint with prejudice. Plaintiffs cannot establish that any alleged failure to warn by GSK was a cause of their injuries. Without evidence of causation, Plaintiffs cannot prove their case and it must be dismissed.

10

1

2  Dated:  February 17, 2010

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

KING & SPALDING LLP


By:＿＿＿/s/ Cheryl A. Sabnis /s/＿＿＿＿＿＿＿
    Donald F. Zimmer, Jr.
    Cheryl A. Sabnis
    Kendra L. Pavkovic

Attorneys for Defendant
GLAXOSMITHKLINE LLC (formerly known as
SMITHKLINE BEECHAM CORPORATION d/b/a
GLAXOSMITHKLINE)

11